JAMES G. TOBIN *vs.* BOSTON HERALD-TRAVELER
CORPORATION.

Suffolk.   May 3, 4, 1949. — June 30, 1949.

Present: QUA, C.J., LUMMUS, DOLAN, SPALDING, & WILLIAMS, JJ.

*Libel and Slander. Evidence*, Competency; Hearsay; Public document;
   Opinion: expert. *Words*, "Mess."

Written communications of several persons, including some prominent
   in public life, and briefs of interested parties, sent to State depart-
   ments having under consideration rival applications for certificates of
   public convenience and necessity for transportation of passengers for
   hire to and from the Logan Airport and a suggested contract with one
   of the applicants giving an exclusive franchise at the airport, being

hearsay and mere expressions of opinion and not public documents, should not have been admitted in evidence in an action for libel to support a defence of truth of a statement, alleged to be libellous, that a brother of the Governor of the Commonwealth was "connected with a 'mess that smells, and smells badly.' "

An opinion expressed in a report by the director of the division of railway and bus utilities in the department of public utilities and individual opinions by commissioners in that department respecting rival applications for certificates of public necessity and convenience for transportation of passengers for hire to and from the Logan Airport were not admissible in an action for libel as public documents to prove a defence of the truth of a statement, alleged to be libellous, that the brother of the Governor of the Commonwealth was "connected with a 'mess that smells, and smells badly,' " and should have been excluded as hearsay and mere expressions of opinion.

A publication, " 'CLEAR IT WITH JIMMY' OR ELSE — If you don't 'clear it with Jimmy' your chances of getting anything out of this administration in the line of patronage are not good. Jimmy is Gov. Tobin's younger brother and according to all available reports, he rules the patronage with an iron hand and if you weren't right in the election, your chances of getting a job can be discounted," was not reasonably susceptible of meaning that "Jimmy" was "soliciting and receiving bribes for the purpose of obtaining appointments to public office . . . and . . . for the letting of contracts for public work by the Commonwealth" and that he had "committed serious wrongs involving moral turpitude," or that he otherwise was guilty of wrongdoing or reprehensible conduct; and as a matter of law it was not libellous.

TORT. Writ in the Superior Court dated February 12, 1946.

A demurrer was overruled by *Hammond*, J.

The action was tried before *Beaudreau*, J.

*F. P. Garland*, for the plaintiff.

*S. C. Rand & B. Aldrich*, (*T. J. McArdle* with them,) for the defendant.

SPALDING, J. This is an action of tort for libel against the publisher of a newspaper. The declaration contains three counts. Counts 1 and 2 are based on alleged libels published by the defendant on February 12, 1946. The third count is based on an item published by the defendant on March 28, 1945. To the first and second counts the defences of truth and privilege were pleaded. The defendant demurred to the third count and the demurrer was overruled. The case then went to trial on all of the counts. On counts 1 and 2 verdicts

were returned for the defendant. On the third count the plaintiff had a verdict. The case comes here on exceptions taken by the plaintiff and on an appeal by the defendant. The exceptions, most of which relate to evidence, arise out of the trial of the first and second counts and the appeal is from the order overruling the demurrer to the third count.

## THE PLAINTIFF'S EXCEPTIONS.

The alleged libels on which the first and second counts were based consisted of the following items of news, which the defendant concedes were published in its newspaper, The Boston Herald, on February 12, 1946: "BUS VETO IS UPHELD, 133–89; WILLIS BRANDS DEAL 'MESS' — Threat Told to Use 'Jim Tobin' to Seal Demand on Airline — The Massachusetts House sustained late yesterday Gov. Tobin's veto of additional bus service to Logan International Airport after three hours of debate in which Speaker Frederick B. Willis exposed members of the Governor's personal and political family as being connected with a 'mess that smells, and smells badly'" (count 1), and "TOBIN BUS VETO UPHELD, 133–89; WILLIS BRANDS DEAL A 'MESS' — Tells Threat by Sutcliffe to Airline — Says 'Jimmy Tobin' Name Used as Lever in Contract Demand — The Massachusetts House sustained late yesterday Gov. Tobin's veto of additional bus service to Logan International Airport after three hours of debate in which Speaker Frederick B. Willis exposed members of the Governor's personal and political family as being connected with a 'mess that smells, and smells badly' " (count 2).

The following facts, most of which do not appear to be in dispute, will be helpful to an understanding of the questions presented for decision: The plaintiff is the brother of Maurice J. Tobin who, at the time the alleged libels were published, was Governor of the Commonwealth. Sutcliffe Storage and Warehouse Company, a Massachusetts corporation (hereinafter called Sutcliffe), on July 17, 1945, filed an application with the department of public utilities for a

certificate of public convenience and necessity to enable it to operate a bus service for the transportation of passengers between the Logan Airport, East Boston, and the Hotel Statler. Attached to the application was a license for the carrying of passengers between these points which had been granted by the city council of Boston on July 9, 1945, and approved by the mayor on July 11, 1945. The proposed fare to be charged by Sutcliffe was seventy-five cents.[1] On September 26, 1945, after a hearing, the department of public utilities rendered a decision ordering that a certificate of public convenience and necessity be issued to Sutcliffe. On September 28, 1945, the Boston Elevated Railway Company (hereinafter called Elevated) filed with that department an application for a certificate of public convenience and necessity to enable it to operate a bus service between the Logan Airport and Copley Square. Attached to its application was a license for a bus service between these points which had been granted by the city council and mayor of Boston on September 25, 1945.[2] The proposed fare was twenty-five cents. This application was "dismissed without prejudice," after hearing, on November 28, 1945. On January 31, 1946, a bill (House No. 250), which had been introduced in the Legislature by a special recess commission established by c. 87 of the Resolves of 1945, was passed by both Houses. It provided that the Elevated could, without compliance with certain provisions of G. L. (Ter. Ed.) c. 159A, carry passengers for hire by motor vehicles between Copley Square and the airport "over the route and subject to the conditions set forth in a license granted by the mayor and city council" of Boston on September 25, 1945. On February 6, 1946, the bill was vetoed by the Governor. The question whether the bill should pass notwithstanding the veto was debated in the House of Representatives on February 11, 1946, and during this debate Frederick B.

---

[1] The application to the city council for a license was filed by Sutcliffe on March 26, 1945.

[2] The application for this license was filed by the Elevated on June 4, 1945. A previous application was filed by the Elevated on December 6, 1944, but no action was ever taken on it by the city council.

Willis, then speaker of the House, spoke in favor of overriding the veto. An account of these proceedings published by the defendant on the following day contained the items which constitute the basis for the first and second counts. The plaintiff was a friend of Maurice H. Sullivan, who was a member of the Boston city council at the time the council acted on Sutcliffe's petition for a license. Sullivan was "close to the plaintiff's brother." The plaintiff also knew William R. Sutcliffe, who was the treasurer and a director of Sutcliffe. There was evidence that the speaker of the House in his speech opposing the veto stated that an official of one of the airlines had told him that William R. Sutcliffe had asked for his assistance in obtaining exclusive transportation privileges at the airport, and that when he refused to render assistance Sutcliffe said to the official, "Well, if you don't do it, I will have Jimmy [meaning the plaintiff] come down and see you. . . . This is now reaching the brass knuckle stage."

1. Several of the plaintiff's exceptions relate to the admissibility of communications sent to the department of public utilities and to the department of public works. On August 23, 1945, while Sutcliffe's application for a certificate of public convenience and necessity was pending before the department of public utilities, Mr. Shattuck, a member of the House of Representatives, sent a letter to the secretary of the department which is set forth in the footnote.[1] In October and November, 1945, when the application of the Elevated was pending before that department, several communications were sent to the department urging that it be granted. One of these letters was from Mr. Shattuck and

[1] "I have received the notice of the hearing to be held on Wednesday, September 5, on D. P. U. 7312, the petition of Sutcliffe Storage and Warehouse Company, Inc., for a certificate of public convenience and necessity for the operation of motor vehicles from the Hotel Statler through the Sumner Tunnel to Porter Street and return. I understand that the Boston Elevated Railway has before the Boston city council a petition for operation of motor vehicles over the same or substantially the same route. As this route is entirely within the area served by the Boston Elevated Railway, and as the people of the district have assumed responsibility for the operating deficits of the Boston Elevated Railway, I believe that the Sutcliffe petition should be denied, and I wish to be so recorded. I shall be unable to attend the hearing."

three were from officials of companies operating airlines out of the Logan Airport. In all of them the writers stated their reasons for favoring the Elevated's application. Another letter was from the legislative counsel of the Associated Industries of Massachusetts in which, among other things, he stated, "We feel that the Elevated . . . is capable of handling this traffic and . . . we feel that this is the best and cheapest service that can be rendered to the airport." There was also a letter from Frederick B. Willis, speaker of the House of Representatives, which included the following: "It is a fact that one bus company now has the exclusive right to operate to the airport, and I wish to respectfully call to your attention that this might jeopardize the future receipt of Federal funds by Massachusetts or its municipalities. Further, it is very obvious that the general public will be discommoded and out of pocket, because of the fact that the present line charges 75¢, as against 25¢, which I understand would be charged by the Boston Elevated Railway Company. It is also my understanding that this bus line is not an established transportation company, as is the Boston Elevated Railway Company. In my opinion, failure to grant the petition of the Boston Elevated Railway Company will be a step toward retarding aviation in Massachusetts, and I therefore sincerely hope that your commission will act favorably upon it as expeditiously as possible."

On October 6, 1945, Sutcliffe sent a letter to the department of public works enclosing a suggested form of a contract to be entered into by it and the Commonwealth by which Sutcliffe was to be given an exclusive concession "to provide and operate all ground transportation" at the airport. While the matter of granting the concession was under consideration, several communications were sent to that department urging that it be denied. One was a letter from Robert F. Bradford, then Lieutenant Governor of the Commonwealth. Another was a letter from an official of one of the airlines. There was also a brief which had been submitted to the department by the counsel for Railway Express Agency, Inc. Referring in his letter to Sutcliffe's pro-

posal for an "exclusive franchise," the Lieutenant Governor stated that he was "opposed to this or any other petition which seeks a monopoly of this kind"; that "Any such proposal would put a stranglehold around the throat of the great air terminal from which the people of this Commonwealth hope so much"; and that "Such a franchise would be an unwarranted and highly serious interference with the public interest." The letter from the official of the airline set forth at length arguments in support of his opposition to the proposed contract. The brief filed by Railway Express Agency, Inc., argued that the privilege sought by Sutcliffe would violate the commerce clause of the United States Constitution and the civil aeronautics act, and that the proposed franchise would be an unlawful interference with its rights and duties as a carrier engaged in interstate transportation by air. The proposed contract was never approved by the department of public works.

All of the foregoing communications were admitted subject to the plaintiff's exceptions. We are of opinion that these exceptions must be sustained. The gist of the alleged libels on which the first and second counts are based is that the plaintiff was "connected with a 'mess that smells, and smells badly.'" Under its answer the defendant had the right to introduce evidence of the truth of this statement which, if proved, would be "a justification unless actual malice is proved." G. L. (Ter. Ed.) c. 231, § 92. The alleged libels were such that a very broad field of inquiry was opened up by the defence of truth. It would be difficult to conceive of a word which is less susceptible of precise definition than the word "mess."[1] It is an extremely abstract concept at best, and when it is characterized metaphorically as something which "smells badly" the problem of determining the admissibility of evidence to prove its truth is not made any easier. In view of the scope of the inquiry opened up by the pleadings, we should hesitate to

---

[1] One dictionary has defined the word as follows: "A confused or disagreeable mixture of things; a hodgepodge. Hence, a situation resulting from blundering or from misunderstanding; a muddle; botch."

say that the evidence discussed above did not have some relevancy to the defence of truth. But if it be assumed that this evidence was relevant, it was, nevertheless, inadmissible. It is clearly hearsay and comes within none of the exceptions to the hearsay rule. Obviously the communications were not public documents within the meaning of that expression in the law of evidence. See *Commonwealth* v. *Slavski*, 245 Mass. 405, 417. They were statements made by third persons out of court voicing their opinions about the advisability of granting or denying the applications under consideration. The obvious purpose of this evidence was to lay before the jury evidence tending to show that there was a bad smelling mess because several persons, including some who were prominent in public life, were of opinion that an exclusive franchise ought not to be granted to Sutcliffe. Not only were these communications objectionable as hearsay but much that was contained in them consisted of the writers' opinions.

2. Several exceptions relate to the admissibility of certain opinions rendered by officials in the department of public utilities which were admitted in evidence. This evidence consisted of the following: An opinion by one Kirley, director of the division of railway and bus utilities in the department, to whom the commission had referred the Sutcliffe application; the opinions (majority and dissenting) rendered by the commissioners of the department in connection with the granting of the Sutcliffe application and the denial of that filed by the Elevated. In his report to the commission Kirley stated that "There seems to be little evidence of public convenience and necessity presented by the petitioner." The dissenting opinion of one of the commissioners on the matter of the Sutcliffe application includes the following: "There is no evidence to indicate that the applicant has had experience in the common carriage of passengers, and . . . [the testimony shows] that they were engaged in the business of warehousing automobiles. . . . The complete inexperience of the applicant in the passenger transportation field is evidenced by the route requested, the proposed fare of seventy-five cents and the type of ve-

hicles to be made available to the public." The dissenting
opinions of two commissioners in the matter of the denial
of the Elevated's application need not be summarized. It
is enough for present purposes to state that they set forth
in considerable detail the opinions of individual commis-
sioners in opposition to the denial of the application. The
exceptions to the admission of this evidence must be sus-
tained. As part of the history of what occurred in connection
with these applications the defendant could undoubtedly
have shown what action was taken by the department. The
plaintiff conceded this when those opinions were offered.
But the opinions of the commissioners as to why they
opposed or favored the granting or denial of these appli-
cations were incompetent. They were not admissible as
public documents. *Carney* v. *Boston Elevated Railway*, 219
Mass. 552, 555. *Commonwealth* v. *Slavski*, 245 Mass. 405,
417. They were objectionable under both the hearsay and
opinion rules. See *Matter of Santosuosso*, 318 Mass. 489, 495.

3. Subject to the plaintiff's exception, eleven checks and
vouchers were introduced by the defendant showing that the
Revere Racing Association, Inc., which operates the Won-
derland Dog Track in Revere, had paid $13,000 to William
R. Sutcliffe between March 19, 1945, and December 31, 1945.
These payments were for "public relations and publicity
services." This evidence was not relevant to any of the
issues on trial. The plaintiff was not shown to have received
any portion of this money nor did the evidence have any
tendency to prove that Sutcliffe's attempt to obtain an ex-
clusive franchise was a mess which "smells badly." The
evidence was not shown to have any connection whatsoever
with Sutcliffe's efforts to obtain a franchise. Moreover, the
payments were made to William R. Sutcliffe individually
and not to the corporation. It is true that there was evidence
that the speaker of the House of Representatives in his
speech advocating the overriding of the veto referred to the
fact that William R. Sutcliffe had received $7,000 or $8,000
from a dog track and "wondered why that had happened."
But that did not make the evidence of this transaction com-

petent to prove the truth of the libels declared on. The evidence raised a collateral issue which might very well have confused and misled the jury.

We are of opinion that the admission of the evidence discussed above was prejudicial to the plaintiff. We have discussed the principal questions argued by the plaintiff. Other exceptions argued by the plaintiff need not be discussed since these questions may not arise in the same form if the case should be retried.

*Exceptions sustained.*

### The Defendant's Appeal.

The only question presented by this appeal is the correctness of the order overruling the defendant's demurrer to the third count of the plaintiff's declaration. That count alleges that on March 28, 1945, the defendant published in its newspaper, The Boston Herald, the following libel: "'clear it with jimmy' or else — If you don't 'clear it with Jimmy' your chances of getting anything out of this administration in the line of patronage are not good. Jimmy is Gov. Tobin's younger brother and according to all available reports, he rules the patronage with an iron hand and if you weren't right in the election, your chances of getting a job can be discounted." There then followed a colloquium identifying the plaintiff as Jimmy. The innuendoes stated that the alleged libel conveyed the meaning that the plaintiff "was soliciting and receiving bribes . . . and . . . had committed serious wrongs involving moral turpitude." The sole ground of the demurrer was that the count failed to state a cause of action.

It is settled that a demurrer to a declaration in libel cannot be sustained unless the words are not reasonably capable of any defamatory meaning. *Twombly* v. *Monroe*, 136 Mass. 464, 469. *Ingalls* v. *Hastings & Sons Publishing Co.* 304 Mass. 31, 34, and cases cited. *Epstein* v. *Dun & Bradstreet, Inc.* 306 Mass. 595, 596. In determining whether a writing is defamatory "The test is whether, in the circumstances . . . [it] discredits the plaintiff in the minds of any consid-

erable and respectable class of the community." *Stanton* v. *Sentinel Printing Co.*, *ante*, 13, 14. *Peck* v. *Wakefield Item Co.* 280 Mass. 451, 454. *Streeter* v. *Eldridge*, 311 Mass. 180, 182. Applying that test here, a majority of the court are of opinion that the publication in question, fairly construed, was not defamatory. The innuendoes interpreting the publication as meaning that the plaintiff was "soliciting and receiving bribes for the purpose of obtaining appointments to public office . . . and . . . for the letting of contracts for public work by the Commonwealth" and that he had "committed serious wrongs involving moral turpitude" are not, we think, warranted. See *Colby Haberdashers, Inc.* v. *Bradstreet Co.* 267 Mass. 166, 170. The plaintiff apparently does not now press this interpretation. But however that may be, we are of opinion that it would be placing a strained and unnatural construction on the writing to impute that meaning to it. The gist of the publication is that Governor Tobin was distributing patronage on the basis of party affiliation or, at least, that such affiliation was one of the factors to be considered, and that he had delegated to his brother, the plaintiff, the matter of determining whether applicants for patronage had the necessary qualifications in this regard. The statement in the publication that the plaintiff "rules the patronage with an iron hand" added little or nothing when read in the light of the words following it, namely, "and if you weren't right in the election, your chances of getting a job can be discounted." That means no more than that the plaintiff was rigidly enforcing the party affiliation requirement, alleged to be essential to the obtaining of patronage. It does not impute wrongdoing or reprehensible conduct to the plaintiff. The expression "Clear it with Jimmy" used in the publication has no invidious connotation. [1] In its context it meant only that patronage must "clear" through the plaintiff.

---

[1] These words, which are quoted, are undoubtedly a paraphrase of an expression attributed to President Franklin D. Roosevelt at the Democratic Convention in 1944. The expression which he is said to have used is "Clear everything with Sidney [Hillman]" and it referred to the necessity of obtaining the latter's approval of the nominee for Vice-President. See Bartlett's Quotations (1948 ed.) 940.

The order overruling the demurrer is reversed, and an order is to be entered sustaining the demurrer. Judgment is to be entered for the defendant on the third count.

*So ordered.*