QUINN BROTHERS, INC. *vs.* STUART WECKER, trustee, & another.[1]

Essex. December 9, 1992. - April 13, 1993.

Present: LIACOS. C.J., WILKINS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Damages*, Breach of contract. *Evidence*, Business record, Hearsay. *Practice, Civil*, New trial.

At the jury-waived trial of a claim for breach of contract, the judge incorrectly excluded as hearsay certain documentary evidence of damages that was admissible as business records under G. L. c. 233, § 78; further, the judge incorrectly ruled that there was no proof of damages; where the opposing party had not pressed a defense in reliance on the judge's exclusion of evidence, the matter was remanded for a new trial, and not merely a determination of damages. [817-822]

The court addressed certain evidentiary issues that might arise on retrial of a civil action involving damages for breach of contract. [822-823]

CIVIL ACTION commenced in the Superior Court Department on September 11, 1985.

The case was heard by *Peter F. Brady*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*James F. O'Brien* for the defendants.

*Michael J. Traft* for the plaintiff.

ABRAMS, J. The plaintiff, Quinn Brothers, Inc. (Quinn), sued the defendants, trustees of S & W Realty Trust (trust), for payment of a contract balance. The trust counterclaimed for breach of the contract. At a jury-waived trial, the judge determined that Quinn violated the contract and found for the trust on Quinn's claim. He also determined that the trust had failed to prove damages and therefore found for Quinn

---

[1] Stephen P. Steinberg, who, with Stuart Wecker, is a trustee of S & W Realty Trust.

on the counterclaim. The trust appealed. We transferred the case on our own motion. We reverse and remand for a new trial.

The judge made the following findings of fact. In 1984, the trust began construction of an office building. It hired Catrambone Development Corp. as its project manager. The trust also hired an architect who designed a building that called for a significant amount of exposed steel. In September, 1984, the trust hired Quinn to fabricate and erect the steel structure.

Quinn contracted to prepare the steel. The trust chose to use the TNEMEC paint system on the exposed steel. In order for the TNEMEC primer to adhere properly, the surface of the steel had to be cleaned thoroughly of all mill scale, grease and contaminants. Quinn agreed to use a solvent and wire brush method to prepare the steel. Quinn also contracted to apply the TNEMEC primer to a thickness of three millimeters.

Quinn prepared and primed the steel in its shop. Quinn then delivered the steel to the site where it was discovered that a small number of beams had been treated, or partially sprayed, with red oxide instead of the TNEMEC primer.[2]

After the steel structure was erected, touch up work was required. The primer coat cracked and peeled in some areas. Quinn performed tests to determine whether the primer correctly adhered to the steel. Except for one spot, the primer adhered to the steel in the tested areas.

The John Ahern Company (Ahern) was responsible for applying the intermediate and finish coats of paint. Catrambone, Quinn, and Ahern agreed that Ahern would complete the touch up work and would be paid from funds allocated to Quinn. Ahern finished the touch up work and applied the remaining coats of paint. Then, in the late spring of 1985, large portions of paint began to peel away, exposing bare steel. A representative of TNEMEC analyzed the problem and concluded that contaminants on the surface of the

[2]The red oxide primer was to cover the unexposed steel.

steel prevented the primer from adhering to the steel. In addition, he noted that the primer was not applied to the thickness of three millimeters, but was only between one and one and one-half millimeters. The trust decided to correct the problem by having Ahern sandblast and repaint the steel.

The judge ruled that the "[d]efendants have demonstrated by a preponderance of the evidence that Quinn failed to properly prepare the steel and apply the primer coat. Such evidence included the mispainted and oversprayed beams, the thin primer coat, and visible contamination of a peeled paint chip." He concluded, however, that the documents the trust attempted to introduce as evidence of damages were hearsay. The judge then ruled that the trust could not recover damages because it had failed to prove them.

*Evidence of damages.* "The basic principle of contract damages is that the aggrieved party should be put in as good a position as if the other party had fully performed." *Laurin v. DeCarolis Constr. Co.,* 372 Mass. 688, 691 (1977). Where there is a defect in the performance of a contract, damages "generally will be based on the market price of completing or correcting the performance." *Concannon* v. *Galanti,* 348 Mass. 71, 74 (1964). Although concluding that Quinn violated the contract, the judge ruled that the trust failed to present evidence to prove damages. We determine that the judge should have admitted certain invoices offered by the trust in evidence. We also determine that the other evidence presented was sufficient to prove damages.

The trust offered some documents as evidence of its costs. One of the trustees, Stuart Wecker, identified them as "various invoices from various contractors and equipment suppliers on the . . . Technology Concepts building project." He also stated that the documents related specifically to "job costs for the time periods that the job was delayed due to the painting and covering up of the steel problems, and to costs from contractors to perform those painting and covering up solutions." Quinn objected to the admission of the documents first on relevance grounds and then as hearsay. The judge sustained the objection based on "hearsay."

General Laws c. 233, § 78 (1990 ed.), governs the admissibility of business records.[3] See *Wingate* v. *Emery Air Freight Corp.*, 385 Mass. 402, 409-410 (1982) (Liacos, J., concurring). In order to be admissible, the custodian must testify that the "record was made in good faith in the regular course of business and before the beginning of the civil . . . proceeding aforesaid and that it was the regular course of such business to make such . . . record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter." G. L. c. 233, § 78. Wecker testified that he kept business records with respect to the construction project. He also testified that he was the custodian of the records kept in the normal course of the trust's business on the construction project and that the entries in the records were made in good faith and contemporaneous with the events they described. In these circumstances, there was no basis for concluding that these records did not fall within the business records statute. The statute contemplates admissibility of records if they represent a system of keeping accounts. The fact that Wecker did not write the invoices does not mean that the records were not the business records of the trust. The trust's record of invoices and checks was a system of accounts made as a record of the trust's transactions. See G. L. c. 233, § 78. These records, taken together, were admissible to show (a) the invoices were received in the regular course of the trust's business and (b) were paid with checks issued by the trust in response to their receipt. The testimony of the witnesses tied

---

[3]General Laws c. 233, § 78 (1990 ed.), reads in part: "An entry in an account kept in a book or by a card system or by any other system of keeping accounts, or a writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall not be inadmissible in any civil or criminal proceeding as evidence of the facts therein stated because it is transcribed or because it is hearsay or self-serving, if the court finds that the entry, writing or record was made in good faith in the regular course of business and before the beginning of the civil or criminal proceeding aforesaid and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter."

the records to the work which Quinn failed to perform properly. The architect said the expenses were reasonable and necessary.[4]

The invoices were received by the trustee. The checks were paid by the trustee. Those records were not inadmissible hearsay. That, however, was only the first step. The trust had to show that the costs billed in the invoices and paid for by the trust's check were related to Quinn's breach of contract and were reasonable and necessary. The trust introduced evidence to support an award of damages, for the removal and reinstallation of the cladding of the structure, the sandblasting and repainting of the steel, and the carrying costs of the construction site. The project architect, Ronald Steffek, and Donald Miller, a representative of TNEMEC, testified as to the reasonableness and necessity of the work done to repair the damage based on violation of the contract. Steffek stated that he saw blisters in the paint. He also said that the blistering worsened until over fifty per cent of the building was affected. Miller testified that paint chips, removed from the structure and analyzed, showed signs of contamination, indicating that the steel had not been prepared properly and that contaminants were present on the steel's surface.[5] In addi-

---

[4]Both parties discuss the admissibility of the documents under Proposed Massachusetts Rule of Evidence 803(6), but in conclusory fashion. Because the issue was not raised below and neither party fully briefed the issue of adopting the proposed rule, we do not discuss it. When a case arises in which the issue has been raised and briefed adequately, we shall consider whether proposed rule 803(6) should be adopted.

[5]Miller testified that the paint chip he received from the site showed "evidence of poor preparation on the back, some contamination, and it was readily apparent." He continued, noting that there was "[e]vidence of loose rust. There's an impression I believe, of mill-scale, and there is evidence of a red material that was removed by a solvent at the time, which we attributed to be overspray of a typical shop, red oxide primer." He also testified that he tested the paint chip to determine its thickness. Miller stated that the test showed a thickness of one to one and one-half millimeters. He then stated that the minimum thickness is two millimeters, with the recommended thickness being two to three millimeters. Miller explained that the thickness of the primer was important because it would be the protection for the steel. Absent proper thickness, the steel would rust prematurely. He also said that, after examining the trust's structure, he

tion, the contract required the primer to be applied to a thickness of three millimeters. Miller testified that the primer had only been applied to a thickness of one to one and a half millimeters. Miller testified that this thickness was below the level of thickness recommended.

There was evidence that the paint was peeling and that the steel had to be sandblasted and retreated. Steffek stated that paint had to be removed and the steel repainted. Miller testified as to the reasonableness of sandblasting in order to repair the damage.[6] Steffek also stated that the choice to remove the paint by sandblasting was reasonable and that $36,000 was a reasonable amount to pay for the sandblasting and repainting of the steel. In order to sandblast and repaint, the cladding had to be removed. Steffek testified that $11,000 was a reasonable amount for removing and replacing the cladding.

Steffek also testified that the need to remove and then replace the cladding and to sandblast and repaint the steel caused a delay in the project of two and one-half months and that the costs identified as resulting from the delay were reasonable.[7]

The trust presented evidence that Steffek, the architect, was familiar with the over-all costs of such big projects, hav-

---

saw a wholesale problem with the adhesion. Miller stated that there was no reason other than the lack of adhesion of the primer coat for the paint to peel off. He also stated that, had the steel been prepared properly, the primer coat would have adhered.

[6]Miller also said that he recommended that sandblasting be done in order to remove the old paint. He explained that it was the "most expeditious and cost effective way to remove paint." He also said that other methods would have been more expensive ultimately.

[7]Steffek was told to assume that the periods of delay were "February of 1985, March of 1985, July of 1985, August of 1985, and September of 1985, and that the carrying costs in those months included laborers, supervisors, security guard, propane fuel, electricity, a trailer, a toilet, an architect inspection fee, and insurance; that the monthly architect inspection fee was $2500, that was the monthly inspection fee for those five months, and that for February the total of those carrying costs was $9,210; in March of 1985, $11,287; in July of 1985, $13,040; in August of 1985, $12,864; and in September of 1985, $11,708."

ing developed budgets in former jobs.[8] Steffek testified that he knew what construction site equipment and personnel were necessary, and the cost of these, should a project run beyond the scheduled finish date. The trust then offered testimony that the expenses were reasonable and necessary and related to the work which Quinn performed unsatisfactorily.

"The [expert] witness . . . may base his opinion . . . upon facts assumed in the questions put to him and supported either by admitted facts or by the testimony of other witnesses already given or to be given at the trial." *Wing* v. *Commonwealth*, 359 Mass. 286, 288 (1971), quoting *Commonwealth* v. *Russ*, 232 Mass. 58, 73 (1919). The trust did introduce sufficient evidence of its damages. Steffek and Miller testified that the work Quinn was required to do by contract was defective and that the work had to be redone. Both testified that sandblasting was a reasonable means of correcting the problem. Steffek stated that the costs incurred in correcting the defect were reasonable and necessary. The trust presented evidence that the costs incurred related to Quinn's breach of the contract. It also presented evidence to support the assumptions on which the architect as an expert relied when he testified as to the reasonableness of the costs. Therefore, there was evidence of damages.

Quinn requests that, should we reverse the decision below, we send the case back for a new trial, not just a determination of damages, because it relied on the trust's inability to introduce evidence of damages and therefore did not press its

---

[8]On cross-examination, Quinn asked Steffek how much a five-gallon container of the product that Ahern used to prime the steel after the sandblasting would have cost at the time of the construction project. He could not recall. Then, when asked the price of a five-gallon container of the finish, he said that he did not recall specifically but would "ball park it in the hundred dollar category." He said his basis for this figure was his "general knowledge of paint systems and their approximate costs." Quinn also questioned him on the cost of the sand used to sandblast the steel. Steffek said that the estimate would be done on the square footage of the surface, not the amount of sand used. The degree of familiarity Steffek has with respect to precise costs goes to the weight of the evidence, not to its admissibility.

claim that it was entitled to notice under the warranty provision of the contract and could have rectified the problem at a lower cost.[9] Quinn asserts that the judge did not rule on this defense. The record supports Quinn's claim that it is entitled to relitigate the warranty issue.

*Issues that may arise on retrial.* The trust sought to prove damages of $48,297 in additional loan interest resulting from the delay in construction. The judge sustained Quinn's objection to the testimony of the trustee, Wecker. The trust asked that the calculation Wecker made to determine the additional interest costs be marked for identification. The judge did not specifically determine that the calculation was a business record. On retrial, the trust must show that the calculation satisfies the requirements of G. L. c. 233, § 78.

We next address the issue of the admissibility of Wecker's testimony as to the additional interest costs, if the calculation is determined not to be a business record.[10] Quinn argues that, although the trustee might have personal knowledge of the costs with which the trust was charged, the knowledge comes from a hearsay document.[11] Wecker did not attempt to testify as to what the trust paid but as to what it was charged. What the trust was charged are "statements made by third persons out of court." *Tobin* v. *Boston Herald-Trav-*

---

[9]The warranty provision reads: "Unless otherwise provided in the Contract Documents, Contractor warrants to Owner that all materials and equipment furnished under this Contract shall be new and shall be of good quality, free from faults and defects and in conformance with the Contract Documents. The Contractor shall correct, within thirty (30) days or such longer period as reasonably necessary while proceeding with due diligence, any defects due to faulty workmanship or material which appear during the first year (or such longer period as may be established in the specifications) after final delivery of possession and occupancy of the Building by Contractor to the purchaser thereof."

[10]If the calculation is determined to be a business record and thus admissible under G. L. c. 233, § 78, then the issue whether Wecker's testimony is founded on hearsay becomes moot.

[11]The record reveals only one document concerning the additional interest costs, the worksheet on which Wecker calculated the carrying costs of the loans during the periods of delay. On the record before us, we do not know if this document was a business record of the trust.

*eler Corp.*, 324 Mass. 478, 484-485 (1949). See P.J. Liacos, Massachusetts Evidence 262 (5th ed. 1981). In addition, there was no testimony that the additional loan interest costs were related to Quinn's breach of contract as well as reasonable and necessary. On retrial, if the document containing the calculations is excluded and the trust does not present any evidence that the interest costs were caused by Quinn's breach of contract and were reasonable and necessary, Wecker may not testify as to what interest the trust was charged. The judgment is reversed and the case is remanded to the Superior Court for a new trial.

*So ordered.*