Per Curiam.
Domenick M. Lepp and Jodi L. Lepp (“Lepps”) commenced this action against M.S. Realty Trust (‘Trust”), Michaela Sukopova, Trustee (“Sukopova”), and John DeSangro ("DeSangro”) for the defendants’ breach of contract, breach of warranty, intentional infliction of emotional distress, and G.L.c. 93A violations arising out of the defendants’ construction and sale of a house to the Lepps. Judgment was entered for the Lepps on all four complaint counts, and the defendants filed this Dist./Mun. Cts. R. A. D. A., Rule 8C appeal.
On December 7, 1998, the Lepps, as buyers, executed an agreement with Sukopova, Trustee of M.S. Realty Trust, as seller, for the purchase and sale of Lot 75 in the Tam Way subdivision in Hatchville, East Falmouth, and for the construction of a house thereon. The plans and building specifications for the house were attached to the agreement and incorporated by reference. The closing date for completion of the construction and delivery of the deed was April 15,1999.
In anticipation of moving into their new home in April, the Lepps put their existing home on the market for sale on December 14,1998. The house sold quickly, and the closing occurred on January 31,1999. The Lepps rented a house for the next several months while waiting for the completion of their new home. Concerned with the cost of renting, the Lepps asked DeSangro, an employee of the Trust and the builder, about accelerating construction. DeSangro assented, assuring the Lepps *45 that the house would be completed by March, 1999.
The relationship between the Lepps and DeSangro soon soured. The Lepps visited the building site twice a day, and became impatient with the builder’s slow progress. To speed construction, the Lepps circulated a punch list of unfinished items to DeSangro and the subcontractors. Apparently resentful of the Lepps’ persistence, DeSangro became increasingly hostile and belligerent, and engaged in offensive, overtly sexual behavior toward Mrs. Lepp in particular. DeSangro continuously belittled her by addressing her in sexual terms such as “sweetheart,” “babe,” and “darling.” His constant comments, routinely made in the presence of third parties, increased in intensity and repugnance over the course of construction, regularly including the following: “You are so beautiful,” “I dream about you,” “You’re giving me a boner,” “I’m so horny — you make me so horny,” “I bet you swap with your neighbors,” and “I bet you do it in every room — christen every room — I’d like to watch you.”
DeSangro told Mrs. Lepp that he would rape her.
DeSangro’s harassing conduct was not limited to the merely verbal. Mrs. Lepp testified that on one occasion, for example, DeSangro “went berserk” at the construction site when she asked him a question, and began yelling that he was “sick of [you] f***ing people and [y]our neighbors,” and that the Lepps were “horrible people.” Mrs. Lepp ran for her car, but DeSangro blocked her from entering it. Pressing his face very close to hers, he continued his verbal tirade. Mrs. Lepp managed to get into her car, fled the scene, and drove to the house the Lepps were renting. But DeSangro followed. As Mrs. Lepp attempted to enter the house, DeSangro jumped from his truck and yelled, “Get out of my way, you f***ing bitch, I’m going to talk to [Mr. Lepp]!” Mrs. Lepp, crying and shaking, shouted for DeSangro to leave and kicked him in self-defense as he pushed his way past her into her house. DeSangro continued yelling that she was a “f***ing” and “no-good bitch,” that he would not allow her back at “my house,” and would sell the Tam Way property for which the Lepps had contracted to someone else. On several occasions, DeSangro drove to the Lepps’ rental home at night and pounded on their door, yelling that their construction requests were costing him money. And there was proof that DeSangro’s rage could escalate into actual physical violence. On one occasion, for example, Mrs. Lepp witnessed DeSangro physically attack and beat an electrician who was leaving the work site.
Knowing that the Lepps had sold their former house, were paying rent and storage charges, and had a mortgage commitment of limited duration, DeSangro repeatedly threatened that “he” would not sell the Tam Way house to them. On more than one date, the Lepps appeared at the construction site only to find that the house was being shown to other prospective buyers.
The closing was held on March 31,1999. Because of Mrs. Lepp’s terror of being in the same room as DeSangro, the parties were sequestered in separate offices. Based on their examination of the newly constructed house prior to the closing, the Lepps had compiled a punch list of defective and incomplete work and requested that funds be reserved to ensure its completion. Trustee Sukopova and DeSangro refused, and DeSangro became extremely belligerent. Shoving his finger into the face of the visibly pregnant bank’s attorney, DeSangro yelled that if there were a hold-back of funds, there would be no closing and he would sell the house to anoth *46 er parly. The Lepps were not represented by counsel at the closing. Against the advice of the bank’s attorney, they signed the closing documents. The deed was recorded the next day.
Several days after the closing, the Lepps again requested that DeSangro complete the items on their punch list. DeSangro responded that he would never set foot in their house again, that he had done all that he was going to do, and the he was both "protected” and “untouchable.”
While DeSangro was refusing to correct and complete the work required by the parties’ contract, he continued to torment and terrify Mrs. Lepp. DeSangro’s construction and marketing of other homes in the same subdivision as the Lepps’ afforded him a ready opportunity to do so. He repeatedly stood across the street, in the street, or on the Lepps’ own property, groped himself, and made obscene remarks and other lewd gestures toward Mrs. Lepp when she dared to go outside. He taunted her by standing on the Lepps’ property line and asking what Mrs. Lepp was going to do about it. DeSangro threatened that he was “going to get [her].” On one occasion when Mrs. Lepp made it out of her front door, DeSangro spotted her and “went nuts,” yelling to prospective buyers to whom he was showing another house that Mrs. Lepp was a “f***ing fruit loop,” that everyone hated her, that she belonged “in a looney bin,” and that her only “claim to fame [was] laying on her back.” As on previous occasions, he yelled that she would never have children and would never be a good mother. The Lepps were compelled to obtain a "Notice of No Trespass” order against DeSangro.
The Lepps also filed a formal complaint against DeSangro with the Town of Falmouth Building and Zoning Department (‘Town”) for building code violations. The Town inspected the Lepps’ home in May and again in August, 1999, and determined that there were multiple violations.[5] At the suggestion of the town building *47 commissioner, the Lepps sought estimates in late 1999 and early 2000 from various contractors to ascertain the cost of remedying DeSangro’s unfinished and substandard work.[6] A builder, Robert Bowman, Sr., ultimately provided the Lepps with an estimate for the repair of DeSangro’s defective work. The Lepps also received two painting estimates from an Eric DeWitt.
After a jury-waived trial, the judge made extensive written findings of fact and conclusions of law and, as noted, found in favor of the Lepps on all of their complaint counts. Judgment was entered against both the Trust and DeSangro for breach of contract in the amount of $5,000.00; against the Trust and DeSangro for breach of warranty in the amount of $20,000.00; in favor of Mrs. Lepp against DeSangro for intentional infliction of emotional distress in the amount of $20,000.00; and in favor of Mrs. Lepp against DeSangro for double damages for DeSangro’s G.Lc. 93A violation in inflicting emotional distress, plus interest, costs, and G.Lc. 93A attorney’s fees. This appeal followed.
1. Trust’s Breach of Contract. There was ample evidence at trial that in addition to numerous items of incomplete or shoddy workmanship, DeSangro failed to satisfy contract specifications for the insulation of the house with Tyvek” and for the gluing of interior floors. The defendants’ excuses that the tar or felt paper actually used by DeSangro as insulation was equivalent to Tyvek, that the winter weather made the use of glue difficult, or that the floor problems caused by DeSangro could be remedied by the installation of screws are irrelevant. As the trial judge properly concluded, “[t]he Lepps specifically contracted for Tyvek and for gluing of the floors, and received neither.”
Massachusetts courts have long held that “[f]or every breach of a promise made on good consideration, the law awards some damage.” Hagan v. Riley, 13 Gray 515, 516 (1859). See also Ashley v. Boch Toyota, Inc., 1992 Mass. App. Div. 35, 36. Contrary to the defendants’ argument, the Lepps’ entitlement to damages for breach of contract did not depend on their proof of the difference between the value of the house as poorly constructed and what the house would have been worth if DeSangro had satisfied contract requirements. When a construction defect “is remediable from a practical standpoint, recovery generally will be based on the market price of completing or correcting the performance.” Concannon v. Galanti, 348 Mass. 71, 74 (1964). See also Quinn Bros., Inc. v. Wecker, 414 Mass. 815, 817 (1993). There was sufficient evidence, including repair estimates, before the trial court to support both the judge’s finding in favor of the Lepps for the Trust’s breach of contract and the judge’s award of damages in the amount of *48 $5,000.00. See generally, as to standard of review, Anzalone v. Strand, 14 Mass. App. Ct. 45, 47 (1982); Brooks v. Connor, 2006 Mass. App. Div. 13, 14, citing Freeman v. Marchi, 30 Mass. App. Div. 114, 122 (1965).
2. DeSangro’s Breach of Contract. While the evidence established that DeSangro’s failure to install Tyvek insulation and to glue the floors constituted a breach of the parties’ agreement for the construction, purchase, and sale of the Lepps’ house, DeSangro was not a party to that contract. The agreement identifies the parties as the Lepps and M.S. Realty Trust, and was signed by the Lepps and by Trustee Sukopova on behalf of the Trust. DeSangro neither signed the agreement, nor is referenced therein. There is no evidence that he was a trustee or a beneficiary of the Trust. Absent other proof, the evidence of his apparent exercise of unfettered control of all aspects of the construction and marketing of the Tam Way development demonstrated only that he was an employee or agent of the Trust.
Builders have been held liable for breach of express contracts for home construction when they executed the contracts as the builders, see, e.g., Carrig v. Gilbert-Parker Corp., 314 Mass. 351, 352-353 (1943), or as the builder-vendors. See, e.g., Albrecht v. Clifford, 436 Mass. 706, 707-708 (2002); Bachman v. Parkin, 19 Mass. App. Ct. 908 (1984). As DeSangro did not sign and was not a party to the agreement at issue in this case, he could not be held liable for breach of that agreement. The trial court’s finding for the Lepps against DeSangro for breach of contract is reversed.
3. Breach of Implied Warranty of Merchantability/Good Workmanship. In its 2002 decision in Albrecht v. Clifford, 436 Mass. 706 (2002), the Supreme Judicial Court recognized the existence of an implied warranty of habitability in the sale of newly constructed homes, id. at 710-711, and a right of recovery for breach of that implied warranty upon proof that the
(1) [plaintiff] purchased a new house from the defendant-builder-vendor;
(2) the house contained a latent defect; (3) the defect manifested itself only after its purchase; (4) the defect was caused by the builder’s improper design, material, or workmanship; and (5) the defect created a substantial question of safety or made the house unfit for human habitation.
Id. at 711-712. The Court cautioned that the implied warranty “does not make the builder an insurer against any and all defects in a home, impose on the builder an obligation to deliver a perfect house, or protect against mere defects in workmanship, minor or procedural violations of the applicable building codes, or defects that are trivial or aesthetic.” Id. at 711. The Court also noted, based on its survey of out-of-State opinions on the subject, that the expansion of implied warranties had resulted in some states in a “blurring” of the distinction between an implied warranty of habitability and an implied warranty of good quality and workmanship. Id. at 709 n.7.
Less than two months after its decision in Albrecht, the Supreme Judicial Court issued its opinion in Berish v. Bornstein, 437 Mass. 252 (2002) in which it extended the reach of the implied warranty of habitability in newly constructed houses to new residential condominium units. Id. at 263. Although the Court cited with approval cases from Florida and Pennsylvania that referred, without distinction, to the implied warranties of habitability and workmanlike construction in the sale of new condo *49 minium units,[7] the Court did not recognize an implied warranty of good workmanship in new home construction, or a cause of action for its breach, in this Commonwealth.[8]
Accordingly, the trial court’s finding in favor of the Lepps for the defendants’ breach of an implied warranty of good workmanship is reversed.
4. DeSangro’s Intentional Infliction of Emotional Distress. liability for intentional infliction of emotional distress is established upon proof “(1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendants conduct was extreme and outrageous; (3) that the defendants conduct caused the plaintiffs distress; and (4) that the plaintiff suffered severe distress.” Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 596 (2001), quoting Sena v. Commonwealth, 417 Mass. 20, 263-264 (1994). Given the ample evidence in the record to support the trial judge’s findings and ruling, we affirm the trial courts award of $20,000.00 in damages to Mrs. Lepp for DeSangro’s intentional infliction of emotional distress.
The defendants argue, unpersuasively, that DeSangro’s conduct never exceeded the level of “mere insults, indignities, threats, annoyances, petty oppressions or other trivialities,” which are insufficient to constitute a basis for liability in tort. Quinn v. Walsh, 49 Mass. App. Ct. 696, 706 (2000), quoting Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466 (1997). The prolonged course of DeSangro’s menacing and predatory conduct throughout and after the construction and sale of the Lepps’ home involved, however, more than a few unpleasantries or passing insults. DeSangro’s unrelieved campaign of sexual harassment, humiliation and slander, his threats of rape and other physical attacks, and his violent outbursts at the construction site, the Lepps’ rental house, and their new home constituted conduct that was so outrageous and extreme as to go “beyond all possible bounds of decency” and to be “utterly intolerable in a civilized community.” Kelly v. Brigham & Women’s Hosp., 51 Mass. App. Ct. 297, 310-311 (2001), quoting Agis v. Howard Johnson Co., 371 Mass. 140, 145 (1976). See, e.g., Haddad v. Gonzalez, 410 Mass. 855, 871 (1991) (defendant-landlord’s sexual harassment and other threatening conduct toward tenant was extreme and outrageous). DeSangro effectively terrorized Mrs. Lepp. She experienced recurring nightmares that continued through the time of trial that DeSangro broke into her home and raped her. She suffered loss of sleep and missed time from work. She required medical treatment and was prescribed medication. Mrs. Lepp was prevented not only from returning to the work site to moni *50 tor the construction of her home, but also, ultimately, from even venturing outside that new home for fear of a confrontation with the explosive, threatening and violent DeSangro.[9] In finding DeSangro’s conduct to be extreme and outrageous, the trial judge was entitled to “put as harsh a face on the actions of [DeSangro] as the basic facts would reasonably allow.” Vittands v. Sudduth, 49 Mass. App. Ct. 401, 411 (2000), quoting Richey v. American Auto. Ass’n, 380 Mass. 835, 839 (1980).
Least availing of DeSangro’s arguments is that Mrs. Lepp failed to establish the necessary causal link between his actions and her emotional distress. See Stonehill Coll. v. Massachusetts Comm’n Against Discrimination, 441 Mass. 549, 576 (2004). DeSangro opines on this appeal that Mrs. Lepp’s severe emotional distress was attributable not to his tortious conduct, but to her “self-imposed housing difficulties,” her marital quarrels, or her mother’s serious illness. It is sufficient to note that no great leap of logic is required to draw the obvious causal connection between, e.g., Mrs. Lepp’s nightmares about being raped by DeSangro and DeSangro’s threat that he would rape her, or her fear of leaving her new home with DeSangro’s constant menacing when she did. In short, the evidence introduced at trial fully warranted the judge’s finding that DeSangro’s conduct caused Mrs. Lepp’s severe emotional distress and that he was, thus, liable in tort for the same.
5. DeSangro’s G.L.c. 93A Violation. To avoid liability on the fourth count of the Lepps’ complaint, DeSangro argues, erroneously, that he did not commit any unfair or deceptive act or practice because the Lepps’ “consumer transaction was successful” in that they received the house for which they contracted at the price and time agreed to by the parties. Conduct in the course of a business transaction violates G.L.c. 93A “if it can be found to be immoral, unethical, oppressive, or unscrupulous; or within the bounds of some statutory, common-law or other established concept of unfairness.” Ellis v. Safety Ins. Co., 41 Mass. App. Ct. 630, 640 (1996). The intentional infliction of emotional distress in the course of doing business is conduct reasonably deemed to be immoral, unethical, or oppressive for G.Lc. 93A purposes. See, e.g., Haddad, supra at 869 (multiple damages awarded under G.L.c. 93A, §9(3) for intentional infliction of emotional distress). Further, G.L.C. 93A permits recovery when unfair conduct “cause [s] a personal injury loss such as emotional distress, even if the consumer lost no ‘money’ or ‘property.’” Hershenow v. Enterprise Rent-A-Car Co. of Boston, 445 Mass. 790, 798 (2006). See also Haddad, supra at 865-866 (following 1979 amendment of G.L.c. 93A, §9, severe emotional distress was loss cognizable under statute). In any event, while a ruling that conduct violates G.L.c. 93A is a legal determination, R. W. Granger & Sons, Inc. v. J & S Insulation, Inc., 435 Mass. 66, 73 (2001), the issue of whether conduct in the context of the circumstances of a particular case is unfair or deceptive is a question of fact for the trial judge. Lily Transp. Corp. v. Royal Institutional Servs., Inc., 64 Mass. App. Ct. 179, 209 n.16 *51 (2005). The trial judge’s finding that DeSangro’s intentional infliction of emotional distress was an unfair act in this case was warranted on the evidence introduced at trial. DeSangro has Med to satisfy his burden on this appeal, id. at 181, of establishing that the trial judge’s finding was clearly erroneous.
Contrary to DeSangro’s final argument, he cannot escape G.L.c. 93A liability simply because he was acting as an agent or employee of the Trust at the time he inflicted emotional distress on Mrs. Lepp. See, e.g., Skowronski v. Sachs, 62 Mass. App. Ct. 630 (2004) (jewelry store employee personally liable for G.Lc. 93A punitive damages for his fraudulent misrepresentation to store customer). DeSangro’s conduct occurred in the course of his activities as agent or employee of the Trust in the context of the “trade or commerce” of the construction and sale of the Lepps’ house. See Standard Register Co. v. Bolton-Emerson, Inc., 38 Mass. App. Ct. 545, 550-552 (1995).
Accordingly, the findings for the plaintiffs against DeSangro for breach of contract, and against DeSangro and the Trust for breach of warranty are reversed and vacated. The trial judge’s findings against the Trust for breach of contract, and against DeSangro for the intentional infliction of emotional distress and G.L.c. 93A unfair and deceptive practices are affirmed.
So ordered.

 The trial judge’s findings described these violations as follows: “the gas fireplace boxout roof and right support post were not secured, and the roof flashing was not installed properly, allowing leakage; the exterior steps from the garage and the slider were not pressure treated nor did they meet code for ‘run and rise’; the door from the garage to the basement was not properly finished, and the blueboarding of the walls and ceiling (presumably of the garage) was incomplete; the dryer vent was improperly installed, and the bathroom-fan vents did not close properly; the bay window was improperly flashed, allowing leakage into the house; the hot-water pipes were not completely wrapped with insulation; the blocking under the girt in the beam pocket was improperly installed; and the joist hanger and the fireblocking over the furnace were not installed.” The trial judge found that other examples of shoddy workmanship by DeSangro included, but were not limited to, improper construction of the main stairways, the cellar stairs, and the garage stairs; interior wall cracking from improper installation and flashing of the bay window; defective installation of half-round above the door; no finish painting on front door; defective exterior painting resulting in gouges, splits, and knots in trim, and bubbling of clapboard paint; splits, open miter joints, knots, and bubbling paint on defective interior trim; improper and incomplete staining and finishing of floors; missing oak thresholds; missing kitchen molding; chipped bathroom vanity and improperly installed inside doors.

 There was evidence that DeSangro even attempted to interfere with that process. The trial judge found: “Mr. Lepp called four or five builders to come to his house to address the problems. Three came. After two had visited, DeSangro stopped them in the street outside the Lepp house, and the Lepps never heard from them again.” The judge also noted that one of the builders, Nick Ayers, told Mr. Lepp before he left the house that he did not want the job because he did not want to be in the uncomfortable position of attempting to remedy someone else’s shoddy work. While DeSangro stopped Ayers outside of the Lepps’ home, he did not threaten him, or attempt to dissuade him from taking the Lepp job.

 The Court quoted Gable v. Silver, 258 So.2d 11, 18 (Fla. Dist. Ct. App. 1972) for the proposition that the “implied warranties of fitness and merchantability extend to the purchase of new condominiums in Florida from builders,” Berish, supra at 263-264, and cited Pontiere v. James Diners, Inc., 426 Pa. Super. 576 (1993) for the proposition that “original purchasers of condominium units may bring suit for breach of implied warranty of habitability and workmanlike construction.” Berish, supra at 264.

 Indeed, the trial judge correctly noted that “Massachusetts law has not explicitly created the availability to new home buyers of a claim for breach of [an] implied warranty for merchantability or good workmanship. But Berish goes far toward doing so....” While we may agree with the judge’s analysis, it is not the function of a trial court or this Appellate Division “to alter established rules of law governing principles of substantive liability.” Burke v. Toothaker, 1 Mass. App. Ct. 234, 239 (1973).

 Mrs. Lepp testified, in part: “Well, I wasn’t sleeping. I was paranoid that he was watching me all the time. I couldn’t go outside my home to even water our newly seeded lawn because he constantly watched me, and made comments, and would stop his truck and stare at me.... He was there every day. If I stepped outside to do any gardening or anything, he was there. I couldn’t even check my own mailbox. I didn’t feel safe enough to walk to my own mailbox.”