## Lily Transportation Corp. *vs.* Royal Institutional Services, Inc. & others.[1]

No. 03-P-1263.

Norfolk. June 4, 2004. - August 5, 2005.

Present: Armstrong, C.J., Perretta, Laurence, Dreben, & Green, JJ.[2]

*Consumer Protection Act,* Unfair or deceptive act, Businessman's claim. *Corporation,* Corporate disregard. *Practice, Civil,* Consumer protection case.

In a civil action arising from an oral agreement to transport goods, the judge was warranted in finding that the individual defendant knew that the plaintiff's agent would believe that the plaintiff's arrangement was with one corporation rather than another, and that the individual defendant fostered that belief; that the actual corporation with which the plaintiff had contracted was in a precarious financial state; and that the individual defendant's conduct was both wilful and knowing, and therefore, the judge's conclusion that the corporate defendant and the individual defendant were in violation of G. L. c. 93A, § 11, was not erroneous as a matter of law. [181-187] Laurence, J., dissenting, with whom Green, J., joined.

In a civil action alleging a violation of G. L. c. 93A, the judge erred in piercing the defendant's corporate veil to reach the assets of the individual defendants, where the wrongdoing was not holding out the corporation as a viable corporation, but rather hiding its existence, and where two individual defendants could not be held liable because they had not participated in misleading the plaintiff. [187-189]

Civil action commenced in the Superior Court Department on September 8, 1999.

---

[1]Mark Johnson, Mark Liebovitz, Shawn Ryan, and Gem Laundry Services, LLC, doing business as Harbor Healthcare Laundry Services (Gem). Gem is not a party to this appeal.

[2]This case was initially heard by a panel comprised of Justices Laurence, Dreben, and Green. After circulation of the opinion to the other Justices of the Appeals Court, the panel was expanded to include Chief Justice Armstrong and Justice Perretta. See *Sciaba Constr. Corp.* v. *Boston,* 35 Mass. App. Ct. 181, 181 n.2 (1993); *Commonwealth* v. *Cruz,* 53 Mass. App. Ct. 24, 24 n.1 (2001).

The case was heard by *Robert A. Mulligan,* J.

*Burton Chandler* for the defendants.

*Steven S. Broadley* for the plaintiff.

DREBEN, J. In early April, 1999, the plaintiff Lily Transportation Corp. (Lily), under the impression that it was contracting with Royal Institutional Services, Inc. (Royal), orally agreed to transport soiled hospital laundry from Philadelphia to Royal's plant in Massachusetts and carry clean laundry back to Philadelphia. After Lily's unpaid bills mounted to more than $150,000, Lily learned that another corporation, Gem Laundry Services, Inc. (Gem), was considered by Royal to be Lily's customer.

Lily thereafter brought this action on numerous counts against Royal, Gem, Mark Liebovitz, and other individuals who were, with Liebovitz, stockholders and principals of Royal and Gem. Following a bench trial, a judge of the Superior Court found against Liebovitz and Royal on a claim of intentional misrepresentation, as well as a claim of wilful and knowing violation of G. L. c. 93A meriting double damages and attorney's fees. He also "pierced" Gem's corporate veil so as to impose liability for its debts on three of its four stockholders, Liebovitz, Mark Johnson, and Shawn Ryan.[3]

This is an appeal by Royal, Liebovitz, Johnson, and Ryan. We affirm the finding of violation of c. 93A by Royal and Liebovitz, including the finding that the violation was wilful and knowing, and we reverse the judgment insofar as it imposes liability on the individual defendants on the theory of piercing Gem's corporate veil. Although the judge also found intentional misrepresentation by Royal and Liebovitz, we do not reach that issue as there cannot be recovery on both c. 93A and intentional misrepresentation.

Since there is a significant difference between the majority of the court and the dissent as to whether the judge was warranted in his c. 93A findings, we will set forth the findings and the supporting evidence in some detail. We preface our discussion

---

[3]Lily's complaint also asserted a claim of quantum meruit against Royal and breach of contract against Gem. The judge ruled against Lily on the quantum meruit claim and imposed liability on the judgment-proof Gem. No appeal has been taken from these rulings.

with the standard of review as explained in *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 509-510 (1997):

> "We do not set aside a judge's findings of fact unless they are clearly erroneous. A finding is clearly erroneous only when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. It is the appellant's burden to show that a finding of fact is clearly erroneous. In applying the clearly erroneous standard, [Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996),] requires that due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. We recognize that the judge, who has a firsthand view of the presentation of evidence, is in the best position to judge the weight and credibility of the evidence. The judge's advantage in weighing the testimony is particularly evident in a case involving conflicting testimony, one in which widely differing inferences could be drawn from the evidence, and the drawing of inferences cannot be separated from the evaluation of the testimony itself. *As a consequence, we do not review questions of fact found by the judge, where such findings are supported on any reasonable view of the evidence, including all rational inferences of which it was susceptible. So long as the judge's account is plausible in light of the entire record, an appellate court should decline to reverse it. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.*" (Internal quotations and citations omitted.) (Emphasis supplied.)

1. *The findings and supporting evidence as to c. 93A violation.* Liebovitz, Johnson, and Ryan are the sole shareholders of Royal, a business that provides laundry services to hospitals in Massachusetts and New Hampshire. In the summer of 1998, with the intention of providing similar services to hospitals in Philadelphia, the three Royal shareholders created Gem, a Pennsylvania limited liability company, together with a fourth shareholder, a corporation, Harbor Hospital Services, Inc. The

principal of the fourth shareholder was a businessman from Philadelphia, Earl Waxman.[4] Liebovitz, Johnson, and Ryan held their two-third interest in Gem through ownership of a Pennsylvania holding company, Royal of PA, Inc.[5] Waxman's corporation owned the remaining one-third interest in Gem.

Gem's initial capitalization was provided, for the most part, by Fleet Bank (bank) ($1,350,000) through a loan that was guaranteed personally by Liebovitz, Johnson, and Ryan, and, in part, by Royal. Waxman lent Gem another $200,000.

Gem began operating in the fall of 1998, doing business as Harbor Healthcare Laundry Services (Harbor). In the beginning of 1999, Gem became unable to process the volume of laundry required under its contracts with various hospitals in Pennsylvania. Gem contracted with Royal and began sending some of its laundry for cleaning to Royal's Worcester plant, in Massachusetts. A few deliveries were made in January and February of 1999. Transportation to and from Massachusetts for these deliveries was provided by Cardinal Logistics, a Philadelphia firm. When that arrangement proved unsatisfactory, Liebovitz sought to have TransLease, a company with which Royal had an existing contract, provide the transportation services. The TransLease contract had been drafted by Robert Kessler, a man Liebovitz had known for several years while Kessler was employed by TransLease.[6]

In mid-March, 1999, Kessler informed Liebovitz that he was now working for another trucking company, namely, Lily. Shortly thereafter, Liebovitz called Kessler to seek his advice as to whether Royal, which still had unused miles on its Trans-Lease contract, could use the excess mileage to move the laundry "for them" from Philadelphia.

After TransLease declined, Liebovitz again called Kessler and asked him to look at the operation in Philadelphia to see if Lily might have any interest in providing transportation in

---

[4] Waxman was brought into the business because of his contacts with hospitals in the Philadelphia area.

[5] The sole corporate purpose of Royal of PA, Inc. was to hold the ownership interest in Gem.

[6] The contract drawn by Kessler was with Westwood Cartage, one of several companies under which TransLease was doing business.

Philadelphia.[7] Liebovitz told Kessler that "we had a new hospital contract starting April first" and that "they were processing linen in Philadelphia the same way they were doing it here in . . . Worcester and Somerville, for hospitals."

Kessler and another Lily employee met Liebovitz at "a building in Philadelphia where they were processing laundry." Asked if there was any "signage" or "[a]nything that identified it," Kessler answered, "Not that I recollect." The judge inferred there were no signs, disbelieving Liebovitz's testimony to the contrary. Although Kessler did not see anything that identified Gem or Harbor, he was told by Liebovitz that the company in Philadelphia was "Harbor." He was never told that Harbor was doing business for a Pennsylvania corporation. Gem was never mentioned.

Liebovitz told Kessler that "they" might have a problem processing laundry in the Philadelphia plant and might have to start moving linen up to Massachusetts to get it processed. He asked Kessler to determine if Lily would be interested.

Kessler understood "they" to be Royal because all his contacts with Liebovitz had been with Royal. He acknowledged that his belief that it was Royal was not from anything Liebovitz "articulated." He made no inquiries because he was "pretty familiar with [Royal's] business," and the Philadelphia operation appeared to be the same as what Royal was doing in Massachusetts. When the trial judge asked Kessler, "Why is it you never clarified who you were dealing with," he replied, "I didn't clarify it, your Honor, because I knew these people very well, I had a great deal of confidence in them, and I would have thought that, if there was another entity they were doing business with, they would have told me."

After discussing the proposal with his "people" at Lily and, after further conversations with Liebovitz, Kessler orally agreed that Lily would provide the requested trucking services from

[7]When informed that there was a written contract for Harbor's local transportation services with another company, Cardinal Logistics, Kessler said there was nothing Lily could do. "We couldn't take the contract away; he had a signed contract." Since there was no written contract with Cardinal for the Massachusetts transport and Cardinal had only performed a few round trips to Massachusetts, Kessler was willing to provide those services.

Philadelphia to Worcester. Although the first delivery was April 7, pricing was not settled until after a few deliveries, and some schedules were not fixed until they were set by electronic messages (e-mails) sent to Kessler by Liebovitz dated April 29, May 7, and May 10, 1999. Kessler testified that the arrangement was a rather "fluid deal primarily because things were changing from day to day." The three e-mails from Liebovitz to Kessler were from an account entitled "royalofma." The first e-mail was received by Kessler before Lily sent the first bill for its services. That bill was sent to Royal on May 5, 1999.

Liebovitz, upon receiving the first bill, sent it to Harbor in Philadelphia. He also informed the operations manager of Lily that bills were to be sent to Harbor, but a later bill in June was also sent to Royal. Notations in Liebovitz's handwriting appeared on both the May and the June bill. Liebovitz knew from these bills that Kessler and Lily were under the impression that Lily was working for Royal. Nevertheless, Liebovitz did not inform Kessler of the billing change despite his continuing contact with Kessler whenever something new came up, and despite the fact, as Kessler testified, that the two had frequent contact for reasons unrelated to this case.[8]

Believing that Lily was contracting with Royal, Kessler informed Lily's financial officers that he had had substantial dealings with Royal at TransLease and that Royal was a good credit risk. As a result, no investigation of finances of any company was made by Lily other than a Dun & Bradstreet report concerning Royal. Kessler testified that had he known that Lily was billing Harbor — he did not find this out until August, 1999 — he would have investigated Harbor's finances.[9]

Although Gem ceased to do business on or about July 23, 1999,[10] and, under the arrangement with the bank, neither Gem

---

[8]All of Lily's bills that were paid were paid by checks bearing Harbor's name. No letters, e-mails, or written material given to Lily at any time, other than the checks, listed Harbor. Gem was never mentioned.

[9]When questioned by the judge, he indicated that there was a well known practice in the trucking industry that when providing services to a new corporation, a credit check is performed.

[10]A stipulation states that Gem ceased doing business on July 28, 1999, but the testimony was that the date was July 23; "on or about July 23" was the date found by the judge.

nor Harbor was permitted to retain Gem's accounts receivable,[11] Liebovitz never informed Kessler of Harbor's (Gem's) demise.[12] As a result, Lily continued to transport laundry to Royal's Massachusetts plants for several weeks, billing a company which Liebovitz knew had no source of income or assets with which to pay for services. All of Gem's assets were pledged as collateral to the bank.

Despite Liebovitz's assiduous avoidance of an explicit statement that Royal was doing business as Harbor, and despite Liebovitz's specific mention of Harbor, the judge found that "Lily had no reason to believe that [Harbor] was anything but a dba or account of Royal." This finding, as well as findings that Liebovitz knew that Kessler would believe that Lily's arrangement was with Royal and that Liebovitz fostered that belief, were supported by a reasonable view of the evidence.

Also warranted are the trial judge's findings that Gem was in a precarious financial state in early April, 1999 when the transportation services commenced, that Liebovitz knew this, and that had Lily investigated, as was its usual practice, it would not have entered into the kind of arrangement that it did.[13]

Harbor's business started in July or August of 1998. It never made a profit. The volume of business grew, but because of labor and other problems, the plant was not working well. Liebovitz testified, "we were probably at forty-four percent [of] the national average" of laundries in productivity. Because of

---

[11]Paragraph 6 of Gem's liquidation agreement with the bank provided that Gem was to collect its accounts receivable in trust for the bank with the first $150,000 to be remitted to Royal on account of services rendered by Royal.

[12]Although the later deceptions (failing to inform Kessler about the billing change, the e-mails from "royalofma," and the failure to inform Kessler or anyone at Lily of Gem's ceasing to do business) did not induce Lily to enter into the arrangement, they may be viewed as bearing on whether Liebovitz's intent when he entered into the transaction was to mislead Kessler and Lily into the belief that Royal was the contracting party. See *Clarke* v. *Second Natl. Bank,* 177 Mass. 257, 262-263 (1901); *Commonwealth* v. *Shraiar,* 397 Mass. 16, 26 (1986); *Commonwealth* v. *Cardarelli,* 433 Mass. 427, 434 (2001); *Hanson* v. *National Surety Co.,* 257 N.Y. 216, 220 (1931).

[13]Lily would certainly have required more prompt payment and would not have continued to provide services while the balances set forth, *infra,* remained outstanding.

its poor production, Liebovitz, Ryan, or Johnson frequently had to come to Philadelphia to monitor the operation. In the beginning of 1999, the company stopped meeting its financial projections although it doubled its volume of business. Royal itself was not being paid by Harbor (and was never paid) for its processing of Harbor's laundry although Harbor was being billed for such services.[14] Liebovitz testified, "we probably cash flowed even through March of '99 and then April, May, and June we started to have some cash flow problems and then stopped doing business in July, early August." Harbor's doors closed on July 23, 1999 because there was "no money for payroll."

An examination of the accounts owed to Lily shows that Harbor was not current in its payments. Although the first bill of May 5 for $11,900 stated that payment was due within seven days, at the end of May, Harbor owed $67,060; at the end of June, $71,990; at the end of July, $112,790; and at the end of August, $151,150. Harbor's last payment was dated July 2.

Unlike the dissent, we consider the following findings by the judge on the c. 93A claim a permissible view of the evidence:

> "Royal, through Liebovitz, misled Lily into believing that Royal was contracting with it (and not [Gem,] a financially unsound corporation). The conduct of Liebovitz at the outset of the relationship failed to apprise Lily of the existence of an entity other than [Royal], and his conduct actively encouraged the impression that Royal was the contracting party. The deceptive conduct on the part of both Liebovitz and Royal caused Lily to act differently than it would have otherwise acted."

Similarly, we consider the judge's finding that Liebovitz's conduct was both wilful and knowing a plausible account of the evidence. See *Demoulas* v. *Demoulas Super Mkts. Inc.*, 424 Mass. at 510.

Accordingly, the judge's conclusion that Royal and Liebovitz were in violation of c. 93A was not erroneous as matter of law.

---

[14]Although Harbor's cash flow problems did not begin until April, 1999, it was not paying its bills in March, at least those owed to Royal for the earlier deliveries made prior to the contract with Lily.

"The Legislature originally enacted c. 93A to improve the commercial relationship between consumers and businessmen. By requiring proper disclosure of relevant information and proscribing unfair or deceptive acts or practices, the Legislature strove to encourage more equitable behavior in the marketplace. See *Commonwealth* v. *DeCotis*, 366 Mass. 234, 238 (1974). By the addition of [G. L. c. 93A, § 11,] by St. 1972, c. 614, § 2, . . . these protections were extended to persons engaged in trade or commerce in business transactions with other persons also engaged in trade or commerce." *Manning* v. *Zuckerman*, 388 Mass. 8, 12 (1983). There was here not only a failure to disclose, but as the judge concluded, Royal, through Liebovitz, actively misled Kessler and Lily into believing that Lily was contracting with Royal. See *Wasserman* v. *Agnastopoulos*, 22 Mass. App. Ct. 672, 677-680 (1986); *Bump* v. *Robbins*, 24 Mass. App. Ct. 296, 311 (1987), and cases cited; *Sargent* v. *Koulisas*, 29 Mass. App. Ct. 956, 957-958 (1990); 940 Code Mass. Regs. § 3.16(2) (1993); McHugh, Bases for Claims Under Chapter 93A — Principles of Unfairness and Deception § 2.4, at 2-47 to 2-51, Chapter 93A Rights and Remedies (Mass. Continuing Legal Educ. 1999 & Supp. 2002).

2. *Piercing the corporate veil.* Lily's complaint also sought to pierce the corporate veil of Gem, a Pennsylvania limited liability corporation, and to look to the assets of the individual defendants, Liebovitz, Johnson, and Ryan, to satisfy the judgment against Gem. In his order the judge stated:

> "Judgment shall enter on Count III for Lily against Liebovitz, Johnson and Ryan for the amounts unpaid by Gem in the amount of $159,650 based on their individual conduct in holding out Gem as a viable corporation when it was simply a vehicle for their individual interests."

We do not consider the piercing of Gem's corporate veil proper in the circumstances of this case. The wrongdoing here was not holding out Gem as a viable corporation but rather hiding its existence. That Royal and Liebovitz misled Lily into believing that it was dealing with Royal, rather than Gem, is not a reason to pierce Gem's veil. For that conduct Royal and Liebovitz, as we have determined in part 1 of this opinion, were directly li-

able under c. 93A. Moreover, as set forth in the margin, the relevant factors leading to a piercing of Gem's corporate veil are not present here.[15,16]

In any event, Johnson and Ryan cannot be held liable. Although they were active in managing Gem, there is no evidence that they participated in misleading Lily. Stockholders who are not involved in the improper transaction or wrongdoing are not liable even when the corporate veil is pierced. See *Jefferson Pilot Bdcst. Co.* v. *Hilary & Hogan, Inc.*, 617 F.2d 133, 136 (5th Cir. 1980) (applying Alabama law); *Lopez* v. *TDI Servs. Inc.*, 631 So. 2d 679, 687 (La. App. 1994); *Slusarski* v. *American Confinement Sys., Inc.*, 218 Neb. 576, 581 (1984).

---

[15]The matter is governed by the law of Gem's place of incorporation. See Restatement (Second) Conflict of Laws § 307 (1971). But see 1 Fletcher, Cyclopedia of the Law of Private Corporations § 43.72 (1999). In any event it does not appear that the law of Massachusetts differs from the law of Pennsylvania. See cases cited in note 16, *infra*.

"[T]here is a strong presumption in Pennsylvania against piercing the corporate veil. *Wedner* v. *Unemployment Bd.*, 449 Pa. 460, 464 (1972) ('Any court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception')." *Lumax Indus., Inc.* v. *Aultman*, 543 Pa. 38, 41-42 (1995). Most of the factors to be considered in disregarding the corporate form set forth in *Lumax*, *supra* at 42, are not present here. Those factors are: "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud." *Ibid.* (citations omitted).

There was here no evidence of undercapitalization; no evidence of a failure to adhere to corporate formalities; and no indication of the mingling of corporate and personal affairs; or that Gem was, in the judge's words, "simply a vehicle for [the stockholders'] individual interests." While Royal and Gem had some degree of common ownership, the individual stockholders were not in complete control of Gem and had a fiduciary duty to the one-third stockholder and principal, Waxman's corporation. See *Evans* v. *Multicon Constr. Corp.*, 30 Mass. App. Ct. 728, 733 (1991).

[16]Although it is not clear from the judge's findings whether he also pierced Royal's veil, in view of the order quoted above, we assume he did not. If our assumption is incorrect, we consider that there were no grounds under Massachusetts law to disregard Royal's separate existence. Consideration of the relevant factors set forth in our cases, see particularly *Pepsi-Cola Metropolitan Bottling Co.* v. *Checker's, Inc.*, 754 F.2d 10, 14-16 (1st Cir. 1985), adopting the standard of *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 619-620 (1968), do not warrant piercing Royal's corporate veil in order to attribute the liabilities of Gem to Royal's stockholders. See *Attorney Gen.* v. *M.C.K., Inc.*, 432 Mass. 546, 555-556 (2000); *Evans* v. *Multicon Constr. Corp.*, 30 Mass. App. Ct. 728, 733 (1991).

See also *Pepsi-Cola Metropolitan Bottling Co.* v. *Checker's, Inc.*, 754 F.2d 10, 16 (1st Cir. 1985); *Aoki* v. *Atto Corp.*, 323 B.R. 803, 814 (Bankr. 1st Cir. 2005). Text writers are in accord. See 1 Fletcher, Cyclopedia of the Law of Private Corporations § 41.32, at 645 ("fraud or inequity must be perpetrated by the person or corporation against whom doctrine is invoked; such party must have been an actor in the course of conduct constituting the abuse of corporate privilege"); 1 Blumberg, Stasser, Georgakoupoulos & Gouvin, Blumberg on Corporate Groups §§ 14.05-14.06A, at 14-17 to 14-20 (2d ed. 2005); Brodsky & Adamski, Law of Corporate Officers and Directors: Rights, Duties and Liabilities § 20.12 (2005).

3. *Conclusion.* The judgment is affirmed against Royal and Liebovitz on the finding of a violation of c. 93A, including the finding of doubling of damages and the imposition of legal fees and costs. The judgment against Liebovitz, Johnson, and Ryan is reversed insofar as it is based on the piercing of Gem's corporate veil.

*So ordered.*

LAURENCE, J. (concurring in part and dissenting in part, with whom Green, J., joins). I disagree with the majority's conclusion that the finding in the plaintiff's favor on the c. 93A count should be affirmed because, I conclude, the most crucial of the trial judge's findings on that issue are unsupported by the record, and because the mundane business bumbling that occurred in this case was not the sort of inequitable marketplace behavior that G. L. c. 93A, § 11, was intended to discourage and punish. The majority correctly quotes the deferential appellate standard ordinarily applicable when reviewing the factual findings of a trial judge who has seen and heard the witnesses, and I remain mindful that credibility, in particular, "is a preserve of the trial judge upon which an appellate court treads with great reluctance. . . . But it is not forbidden territory. There are exceptional cases 'where [even] such findings have been changed in whole or in part on appeal, because plainly wrong.' " *Springgate* v. *School Comm. of Mattapoisett*, 11 Mass. App. Ct. 304, 310 (1981), quoting from *Spiegel* v. *Beacon Participations, Inc.*,

Lily Transportation Corp. *v.* Royal Institutional Services, Inc.

297 Mass. 398, 407-408 (1937).[1] This is, in my view, such a case because, considering the evidence as a whole, and in light of the evolving body of law under c. 93A involving business transactions, I am left with the definite and firm conviction that the judge's outcome-determinative findings are plainly wrong.[2]

---

[1] I note, however, that none of the findings I identify as clearly erroneous were based on the judge's express credibility choices of Kessler or the other Lily witnesses over Liebovitz, the defendants' sole witness, although the tone and conclusions of the opinion clearly communicate a censorious view of Liebovitz's handling of the transaction with Lily. Although the majority relies on certain credibility findings as justifiable inferences by the judge (e.g., as to whether a sign identifying the Philadelphia operation Kessler visited as "Harbor Healthcare Laundry Services" appeared on the building), I also note that "[i]nferences from the basic facts . . . are open for our decision, and the inferences drawn by the trial judge are entitled to no weight in this court," *Simon* v. *Weymouth Agric. & Industrial Soc.*, 389 Mass. 146, 148 (1983), quoting from *Malone* v. *Walsh*, 315 Mass. 484, 490 (1944); see also *National Med. Care, Inc.* v. *Zigelbaum*, 18 Mass. App. Ct. 570, 574 (1984), and that disbelief of testimony does not provide a basis on which the contrary proposition can be found. See *Commonwealth* v. *Michaud*, 389 Mass. 491, 498 (1983); *Harris* v. *Doyle*, 14 Mass. App. Ct. 1037 (1982); *Kaitz* v. *Foreign Motors, Inc.*, 25 Mass. App. Ct. 198, 200 (1987).

[2] Our appellate courts have, notwithstanding the deferential standard of review, never hesitated to reverse for clearly erroneous factfinding whenever they are convinced such a mistake has been committed. See, e.g., *Fitchburg Hous. Authy.* v. *Board of Zoning Appeals of Fitchburg*, 380 Mass. 869, 872-873 (1980); *Simon* v. *Weymouth Agric. & Industrial. Soc.*, 389 Mass. at 150-152; *Strand* v. *Herrick & Smith*, 396 Mass. 783, 788-789 (1986); *Howard* v. *Burlington*, 399 Mass. 585, 587-589 (1987); *Kennedy* v. *Kennedy*, 400 Mass. 272, 274-275 (1987); *Kendall* v. *Selvaggio*, 413 Mass. 619, 622 & n.5 (1992); *Williams* v. *Resolution GGF Oy*, 417 Mass. 377, 382-384 (1994); *Sutton Corp.* v. *Metropolitan Dist. Commn.*, 423 Mass. 200, 209 (1996); *Merola* v. *Exergen Corp.*, 423 Mass. 461, 463-465 (1996); *Taylor* v. *Lassell*, 4 Mass. App. Ct. 539, 540-541 (1976); *Conte* v. *School Comm. of Methuen*, 4 Mass. App. Ct. 600, 604 (1976); *Steranko* v. *Inforex, Inc.*, 5 Mass. App. Ct. 253, 267-268 & n.13 (1977); *Planning Bd. of Watertown* v. *Board of Appeals of Watertown*, 5 Mass. App. Ct. 833, 833-834 (1977); *Levine* v. *Amber Mfg. Corp.*, 6 Mass. App. Ct. 840, 841 (1978); *National Car Rental Sys., Inc.* v. *Mills Transfer Co.*, 7 Mass. App. Ct. 850, 851-852 (1979); *Petti* v. *Putignano*, 8 Mass. App. Ct. 293, 294 (1979); *Western Mass. Elec. Co.* v. *Sambo's of Mass., Inc.*, 8 Mass. App. Ct. 815, 819-820 (1979); *Chevalier* v. *Chevalier*, 9 Mass. App. Ct. 80, 82 (1980); *Silkey* v. *New England Tel. & Tel. Co.*, 9 Mass. App. Ct. 816, 817 (1980); *Hudson* v. *Oliveira*, 10 Mass. App. Ct. 868, 870 (1980); *Commissioner of Code Inspection of Worcester* v. *Worcester Dynamy, Inc.,* 11 Mass. App. Ct. 97, 99 (1980); *Springgate* v. *School Comm. of Mattapoisett*, 11 Mass. App. Ct. at 309-311; *Professional Economics, Inc.* v. *Professional Economic Servs., Inc.*, 12 Mass. App. Ct. 70, 72 & n.3 (1981); *Myers* v. *Salin*,

On my view of the facts, the majority has erroneously transmuted a garden-variety commercial transaction, arising out of a loosely undertaken oral agreement — characterized by imperfect communications, questionable assumptions, and informal and slack business practices — into a wilful, knowing, "assiduous" campaign of deception. As does the majority, I must set forth the evidence in detail to demonstrate the errors I discern.

*Counterstatement of factual background.* Defendants Liebovitz, Johnson and Ryan are the sole shareholders of Royal, a business based in Southboro that provides laundry services to Massachusetts and New Hampshire hospitals. In the summer of 1998, Liebovitz, Johnson and Ryan, seeking to expand their business into the Philadelphia area, created a separate company

13 Mass. App. Ct. 127, 138-140 (1982); *Talbot* v. *Talbot*, 13 Mass. App. Ct. 456, 458 (1982); *Randall* v. *Randall*, 17 Mass. App. Ct. 24, 30-31 (1983); *Stylianopoulos* v. *Stylianopoulos*, 17 Mass. App. Ct. 64, 70 (1983); *Turner* v. *Leonard, Inc.*, 17 Mass. App. Ct. 909, 910 (1983); *Di Giovanni* v. *Board of Appeals of Rockport*, 19 Mass. App. Ct. 339, 345 & n.11 (1985); *Smith* v. *Binder*, 20 Mass. App. Ct. 21, 22-23 (1985); *Phipps* v. *Barbera*, 23 Mass. App. Ct. 1, 7 (1986); *Rent Control Bd. of Cambridge* v. *Cambridge Tower Corp.*, 24 Mass. App. Ct. 75, 77 (1987); *Crittenton Hastings House of the Florence Crittenton League* v. *Board of Appeals of Boston*, 25 Mass. App. Ct. 704, 714-715 (1988); *Parrish* v. *Parrish*, 30 Mass. App. Ct. 78, 89 & n.15 (1991); *Atkinson* v. *Rosenthal*, 33 Mass. App. Ct. 219, 223-225 (1992); *Alcan Aluminum Corp.* v. *Carlton Aluminum of New England, Inc.*, 35 Mass. App. Ct. 161, 164 (1993); *Credit Data of Central Mass., Inc.* v. *TRW, Inc.*, 37 Mass. App. Ct. 442, 449 (1994); *Cooke* v. *Lynn Sand & Stone Co.*, 37 Mass. App. Ct. 490, 500-501 (1994); *Papale-Keefe* v. *Altomare*, 38 Mass. App. Ct. 308, 311-312 (1995); *R.H.* v. *B.F.*, 39 Mass. App. Ct. 29, 41-42 (1995), *S.C.* sub nom. *Custody of Vaughn*, 422 Mass. 590 (1996); *Churgin* v. *Hobbie*, 39 Mass. App. Ct. 302, 306 (1995); *Parker* v. *D'Avolio*, 40 Mass. App. Ct. 394, 395-397, 401, 403 (1996); *Fredericks* v. *Rosenblatt*, 40 Mass. App. Ct. 713, 717-718 (1996); *Care & Protection of Bruce*, 44 Mass. App. Ct. 758, 763-764 (1998); *Commerce Bank & Trust Co.* v. *Hayeck*, 46 Mass. App. Ct. 687, 692-693 (1999); *Discover Realty Corp.* v. *David*, 49 Mass. App. Ct. 535, 537-538 (2000); *Rosenthal* v. *Maney*, 51 Mass. App. Ct. 257, 267 (2001); *Yankee Microwave, Inc.* v. *Petricca Communications Sys., Inc.*, 53 Mass. App. Ct. 497, 521-523 (2002); *Cuddy* v. *A&E Mechanical, Inc.*, 53 Mass. App. Ct. 901, 902 (2001); *Ball* v. *Planning Bd. of Leverett*, 58 Mass. App. Ct. 513, 518 (2003); *Bertrand* v. *Board of Appeals of Bourne*, 58 Mass. App. Ct. 912 (2003); *Diamond Crystal Brands, Inc.* v. *Backleaf, LLC*, 60 Mass. App. Ct. 502, 508 (2004); *Canavan* v. *Civil Serv. Commn.*, 60 Mass. App. Ct. 910, 911 & n.4 (2004); *Bui* v. *Ma*, 62 Mass. App. Ct. 553, 564-565 (2004); *Murphy* v. *Olsen*, 63 Mass. App. Ct. 417, 421-422 & n.14 (2005).

with a businessman from Philadelphia, Earl Waxman.[3] This company, Gem, a limited liability corporation formed under Pennsylvania law, lawfully conducted business under the name Harbor Healthcare Laundry Services (Harbor) (see note 8, *infra*) and planned to provide laundry services to hospitals in the Philadelphia area. Liebovitz, Johnson and Ryan held a two-thirds interest in Gem through a holding company they owned, Royal of Pa.,[4] while Waxman controlled the remaining one-third interest in Gem. Fleet Bank provided a substantial part ($1,350,000) of Gem's initial capitalization, through a loan that was guaranteed in part by Royal and personally by Liebovitz, Johnson and Ryan. Waxman lent Gem another $200,000. Gem and Royal shared the same accountant, who was located in Worcester, but Gem's bookkeeping services were separate from Royal's, and Gem filed its own tax returns. Liebovitz, Johnson and Ryan were each involved at one time or another in the daily management of Gem's operations in Philadelphia.

Gem had begun operating (with a labor force of about 100 employees) under the name Harbor in the fall of 1998. Because, however, of the small size of its Philadelphia facility and the limited capacity of its equipment, as well as unspecified labor problems, it soon discovered that it could not handle the volume of laundry that it had contracted to clean (substantially through Waxman's contacts and auspices) for various hospitals in the Philadelphia area. Gem then entered into a contract with Royal for the use of Royal's plant in Worcester to provide additional laundry cleaning, and Royal billed Gem for those services. The soiled laundry was to be transported from Philadelphia to Massachusetts, cleaned there by Royal, and then transported back to the Pennsylvania hospitals.

The individual defendants initially had Gem enter a written agreement for hauling the overflow laundry to Massachusetts with a trucking company in the Philadelphia area called

---

[3]Waxman was brought into the business because of his ability to help capitalize the new company, his contacts with hospitals in the Philadelphia area, and the fact that the name he had used doing business, Harbor Healthcare Services, Inc., was well-known in the area as a hospital linen supply company.

[4]The sole corporate purpose of Royal of Pa. was to hold this ownership interest in Gem.

Cardinal, but Cardinal proved unsatisfactory after some trial deliveries. They then sought to secure that transportation through Trans-Lease, the company which had an existing written contractual relationship with Royal for laundry hauling in New England. That contract had been brokered (and, indeed, drafted) by Kessler in September, 1998, when he was employed by Trans-Lease. Sometime in March, 1999, however, Trans-Lease notified Liebovitz that it was not interested in making deliveries from Philadelphia to Massachusetts.

While Liebovitz was attempting to strike a deal with Trans-Lease, Kessler, who had left Trans-Lease in mid-March, 1999, and had gone to work for Lily, a Needham-based trucking corporation with offices around the country, contacted Liebovitz to apprise him of his move to Lily and to offer Lily's services should Liebovitz need them. Liebovitz subsequently called Kessler from Philadelphia to inform him that he had an "operation in Philadelphia" doing linen processing for hospitals in that area and invited Kessler to visit "the operation" to see if Lily might have an interest in providing transportation services. Kessler said that he was going to be in the Philadelphia area as one of his new territories and agreed to meet Liebovitz at his facility there.

Kessler met Liebovitz sometime in late March, 1999, at the building in Philadelphia where the hospital laundry was being processed, 900 Jefferson Street. Liebovitz testified that a sign on the only door to the building read "Harbor Healthcare Laundry Services," although Kessler did not recall seeing a sign. Liebovitz, however, expressly told Kessler at the time that the company doing the laundry at the facility was Harbor Healthcare Services, although he did not mention Gem. Kessler inquired no further about the specific identity or relationships of the company or the operation but simply assumed, based solely on his prior dealing with Liebovitz while at Trans-Lease, that Harbor was Royal's operation in Philadelphia. At no time did Liebovitz say anything suggesting that the Philadelphia operation was owned by Royal or run under Royal's auspices, and Kessler conceded that his assumption that he was doing business with Royal was not the result of anything Liebovitz ever said. Liebovitz informed Kessler that "he" had a written

transportation contract for trucking services for the Philadelphia operation with a company called Cardinal, in which the parties were clearly stated to be Gem (operating under the name Harbor) and Cardinal, but Kessler never asked to see that contract.

No agreement ensued following Kessler's visit, but soon thereafter, in early April, 1999, Liebovitz called Kessler to tell him that "they" had a large new hospital account in Philadelphia starting late in April. That account had to be processed immediately but its volume was beyond the capacity of the Philadelphia plant for a variety of operational reasons (including labor problems) and therefore had to be transported to Royal's facility in Worcester on a daily basis for processing and then returned to Philadelphia. Liebovitz explained that Cardinal had been used for such hauls but had not worked out and asked Kessler if Lily would be interested in the business. Kessler assumed that by "they" Liebovitz meant Royal, again solely because of his prior dealing with Leibovitz in Massachusetts on the Trans-Lease contract.[5]

Kessler discussed the proposal with his "people" at Lily and, after further conversations with Liebovitz about scheduling, orally agreed that Lily would provide the requested trucking services from Philadelphia to Worcester, even though no prices were set at that time. Liebovitz provided Kessler with price information based on deliveries to Worcester that Cardinal had recently made under its contract with Gem doing business as Harbor. Although he did not ask to see the Cardinal contract, Kessler assured Liebovitz that Lily's price would not be more

---

[5]The judge's finding that Liebovitz "knew" Kessler would conclude that Lily would be working for Royal in the undertaking was unsupported by any testimony of either Liebovitz or Kessler (the only witnesses to the transaction). Kessler repeatedly conceded that his assumption that in any transportation arrangement Lily would be doing business with Royal was not because of anything Liebovitz ever said or did or anything Kessler asked. Kessler "believed it was Royal, for whatever reason." He simply assumed that "if there was another entity they were doing business with, they would have told me," although he conceded that Liebovitz had in fact expressly "told [him] that the company [Liebovitz was seeking trucking services for in Philadelphia] was Harbor," and that he knew "that Harbor was the entity that was doing the work in Philadelphia, itself, doing the laundry for the hospitals in Philadelphia."

than Cardinal's and could be firmed up after a few deliveries had been made. Liebovitz believed that the likely price per pound to be set could be supported by the Philadelphia operation until it had resolved its equipment and labor problems and was operating at capacity, which he thought would be within six months. Given the anticipated short-term basis for the arrangement, no written contract — which would have clearly identified the parties to the agreement — was entered into, since it was apparently Lily's policy not to do so for agreements of less than a year's duration, and also because of Kessler's view of the arrangement as "a fluid deal . . . [with] things . . . changing from day to day."

Before any deliveries were made, Kessler had to get his superiors at Lily to authorize the agreement, which he identified for them as being with Royal. He spoke with Lily's chief financial officer, who informed him that a credit reference would have to be obtained before Lily would make any deliveries. Kessler, continuing to assume that he was dealing with Royal, told his superiors that he knew the company well, that in the summer of 1998, when he was at Trans-Lease, they had performed a "due diligence" inquiry on the company and that Trans-Lease never had a problem collecting a nickel. Ordinarily Lily would obtain a Dun & Bradstreet rating, a bank reference, and two credit reports for new customers. Based on Kessler's "say so," however, Lily supposedly obtained only a Dun & Bradstreet report on Royal (which, however, was subsequently "lost" and its contents never revealed). Had Kessler known that the contracting party was not Royal, he would not have entered into the contract without further investigation, because without further inquiry he "wouldn't have done business with an entity that I didn't know."[6]

In early April, 1999, Lily began transporting soiled laundry

---

[6]The judge's finding that Liebovitz "knew" that Lily would not perform trucking services for Gem because it was an entity that "was not a good credit risk" was unsupported by the record. There was no evidentiary basis for the judge's observations that Gem "had been losing money since the end of 1998" and was "insolvent" when the contract was entered in April, 1999. The only evidence on these points came from Liebovitz, who in fact testified (without contradiction): (a) that the Royal principals had joined forces with a substantial local individual, Waxman, who had established contacts with many

from the Harbor facility in Philadelphia to Worcester and clean laundry back to Philadelphia. On the basis of Kessler's "say

hospitals in the Philadelphia area, had always anticipated Gem would be a profitable company, had made projections that confirmed their expectations, and had set contract prices that were "very good," higher in fact than competitive prices, set to yield a "sizeable gross profit"; (b) that Gem had increased the volume of its business every month, had "broken even as of the end of 1998," and "was still on schedule going into the end of 1998" — indeed, Gem was "even through March 1999" — and did not start to have cash flow problems until later in the spring of 1999; and (c) that Liebovitz was confident when he negotiated with Kessler that the price he was getting for laundry in Philadelphia would sustain the facility until its operational problems were resolved and the plant was up to capacity, a result he anticipated by the fall of 1999. Compare *USM Corp.* v. *Arthur D. Little Sys., Inc.,* 28 Mass. App. Ct. 108, 125 (1989) ("USM . . . contends that ADL acted [in violation of G. L. c. 93A, § 11,] . . . when it failed to disclose to USM the insolvency of [its corporate subsidiary] ADLS . . . [but] there was no credible evidence to support the proposition that ADLS was not viable financially at the relevant times").

In short, the record is devoid of evidence to support the premise that as of the date the contract was entered in early April, 1999, Gem was in or near a state of insolvency in either commonly understood sense, i.e., unable to pay its debts in the ordinary course, *Lee* v. *Kilburn,* 3 Gray 594, 600 (1854), or carrying debts in excess of its assets. Compare G. L. c. 109A, § 3 (Uniform Fraudulent Transfer Act). See also 11 U.S.C. § 101(32) (2000) (chapter 11 of United States Bankruptcy Code). The fact that a company, particularly a new company like Gem, is not "profitable" early on or not meeting its "projections" is a far cry from establishing financial unsoundness, much less insolvency. Indeed, the judge himself recognized that at the outset Liebovitz honestly anticipated Harbor would succeed, noting that "Liebovitz may have believed that the price per pound that he was getting for the laundry could sustain the operation until he could get the plant up to capacity."

In fact, at the outset Harbor paid its bills in the ordinary course. It initially made six payments to Lily between the end of May and the beginning of July, which compensated Lily for all of its April deliveries and many of its May deliveries, and no billing concerns were expressed by anyone at Lily until late July, 1999. No one testified, nor was any evidence introduced indicating, that Lily would have refused to enter an agreement had it known the other party was Gem, particularly in light of the short-term nature of the arrangement and Gem's actual financial position as of early April, 1999. Kessler revealingly testified that had he been informed that the entity Lily was dealing with was not Royal, i.e., was Harbor or Gem, he "would have asked . . . [for] further information on the company," not that he would never have done business with Gem. The thrust of Kessler's testimony was that, based on his experience at Trans-Lease, before a trucking company entered an arrangement with an account "on a large exposure basis," when they were "going to do a considerable amount of work for [the] company you would investigate." The record is devoid of evidence indicating what such an investigation of Gem in early April, 1999, would have shown — we have no idea what a credit report

so," Lily's first bill for services was sent on May 5, 1999, to Royal at its Southboro corporate office. When Liebovitz was informed of this, upon Royal's receipt of Lily's invoice, he immediately instructed the Royal clerk to fax the bill to him at Harbor in Philadelphia and by telephone informed his sole operational contact at Lily, Frank Napoli, Lily's operations and dispatch manager, to change the address and the name on the bill to Harbor and to send all bills thereafter to Harbor for payment by Harbor. No other communications during the relevant period mentioned Royal except as the destination of the laundry being hauled from Philadelphia.[7] On Lily's accounts receivable

would have revealed or predicted or what Lily would have done had it known of Gem's involvement and financial picture as of early April, 1999. (Indeed, we have no idea what the credit report Lily was said to have "pulled" on Royal at the time indicated, since Lily's employees had "lost" it at some undetermined time.)

The fact mentioned by the majority, that Royal did not get paid by Harbor for its services, is without significance on the issue of Gem's financial soundness when the trucking deal was arranged in early April, 1999, because Harbor (Gem) could not have owed Royal money until after Royal actually started performing the excess laundry services. Royal did not start performing any such work until Lily had entered the agreement and had started making the deliveries to Royal in Worcester, subsequent to early April. Moreover, the record contains nothing describing the terms governing Harbor's obligation to compensate Royal for its services and is bereft of any evidence that Harbor was or would have been unable to pay its foreseeable debts to Royal when Liebovitz and Kessler made their deal.

Finally, there was no evidence that Liebovitz "knew" or even suspected that Lily would never have entered in the short-term trucking arrangement if it had been aware that Gem, doing business as Harbor, was the contracting party. The evidence tended in fact to the contrary, given Liebovitz's rosy, if ultimately unrealistic, view of Gem's business prospects; his knowledge that the Harbor name was well-established in the Philadelphia area; the substantial volume of business Gem had attracted; and (perhaps most significant as an indicator of industry practice and perspective) the fact that Gem had already established a contractual relationship for trucking services in its own name with Cardinal.

[7] In late April and early May — well after the oral agreement had been entered into and performance under the agreement had begun — Liebovitz communicated on three occasions with Kessler about trucking schedules from an electronic mail (e-mail) address of "royalofma@aol.com." Contrary to the majority's characterization of it, "royalofma" was not an "account" but a user name Leibovitz chose for an e-mail account he maintained with a private third party Internet service provider. Liebovitz testified (again without contradiction) that this was his personal e-mail account, and, since the e-mails

records, the customer was consistently described as "Harbor Healthcare Laundry Svcs."

That bill and all subsequent bills, which were sent by Lily to Harbor by name at its 900 Jefferson Street, Philadelphia facility, were paid by checks bearing the printed account name "Harbor Health Care Laundry Services." Liebovitz did not mention the billing change to Kessler, who was not involved in billing or payment matters for Lily and with whom Liebovitz had no dealings after sealing the deal in early April, except for certain scheduling matters (see note 7, *supra*) and various contacts on matters unrelated to the trucking arrangement. Liebovitz never explicitly told anyone at Lily that the redirection of billing reflected the fact that Gem (doing business as Harbor) was Lily's customer in the arrangement and not Royal. The redirection of the invoices to a different entity and their consistent payment by that entity did not spur anyone at Lily to inquire about the ostensible change in customer identity or to seek a credit check or investigate the financial or corporate status of Harbor, notwithstanding Lily's purported exigence in checking out the organizations with whom it had business dealings, and Kessler's testimony that, if he had been advised of the billing change, he would have asked for further information about the new entity.[8]

Lily's bills sent to Harbor in Philadelphia continued to be

dealt with the timing of deliveries by Lily of Harbor laundry under Gem's contract with Royal as well as under Lily's agreement to haul that laundry from Philadelphia to Royal's Worcester plant, standing alone the e-mails were consistent with Royal's known involvement in the arrangement and would not justify or corroborate Kessler's assumption (as the judge intimated) that the Philadelphia operation was Royal's. The judge seemingly found significant, in this respect, that no stationery or business cards bearing the names Gem or Harbor were ever printed or used by Liebovitz in communicating with Lily, but his finding with respect to stationery was erroneous, as Liebovitz testified (again without contradiction) that Gem did use stationery bearing Harbor's name in its business communications, and Lily's bills were all paid by checks bearing Harbor's name and address.

[8]In light of Kessler's testimony and the significant fact that the bills were paid on Harbor's checks, there was no basis for any finding that Lily and its employees "reasonably believed" that the bills were merely being sent to another office under Royal's control and that Harbor was simply a name under which Royal did business. The other Lily employees who testified in fact said that they had no recollection about the matter or, to the extent they did, had no idea whether or not Harbor was another name for Royal or some

paid for many weeks by checks prominently bearing the name "Harbor Health Care Laundry Services." However, Gem had not prospered as Liebovitz had anticipated, encountered severe cash flow problems, and had to cease doing laundry business on or before July 28, 1999. Kessler was contacted in August, 1999, by Lily's credit people saying that "Royal" had not paid "for some period of time" and owed "a lot of money." Lily, initially uninformed of Gem's cessation of business, continued to make pick-ups and deliveries between Philadelphia and Worcester for a few weeks thereafter, accumulating over $150,000 in unpaid trucking bills under the arrangement.[9]

Gem ultimately defaulted on all of its loans. When Gem's principal lender, Fleet Bank, sold the collateral that had been pledged to secure Fleet's loans to Gem later in the year, Royal purchased certain of Gem's assets from Fleet for $450,000. This purchase was made pursuant to an August, 1999, liquidation agreement between Fleet Bank and all the defendants. Royal

other company. They simply assumed it was Royal because Kessler had told them to set up the account under Royal's name. Napoli's memory was that Kessler had told him Royal was the customer but that Liebovitz, who dealt with him daily on shipping details, had never mentioned or discussed with him who the customer was, nor had Napoli ever asked. Our conclusion is further supported by the Pennsylvania "Fictitious Names Act," 54 Pa. Cons. Stat. §§ 301-302, 311(b)(2), which allows corporations to operate under registered fictitious names that need not contain a corporate designator, and Massachusetts law that a corporation is charged with knowledge of the relevant laws affecting its business in all states in which it conducts business. See *Nissan Motor Corp.* v. *Commissioner of Rev.*, 407 Mass. 153, 160 (1990), and cases cited (emphasizing that "a citizen like Nissan is charged with knowledge of the tax laws wherever it does business").

[9]The $150,000 appeared to reflect services Lily performed both before and after Gem's cessation of business. At the time Gem ceased doing business, it also owed Royal $500,000 to $600,000 for unpaid cleaning services. Liebovitz testified that the Harbor facility in Philadelphia continued to service and bill its hospital clients in the area after July 23, 1999, and merely stopped actually washing the laundry. Kessler testified that after learning of the unpaid bills in August, 1999, he tried to reach Leibovitz but could not, so he talked to defendants Johnson and Ryan about payment, at which time he first became aware of Gem's involvement. They told him they would "try to get us paid," but nothing definite came of the discussions. Moreover, even after hearing that Harbor's business in Philadelphia "was under a corporate guise called Gem," Kessler never asked for details or protested that he had been misled. When asked why he had not inquired further at the time, Kessler testified, "I don't know. I should've but I didn't."

and the individual defendants were parties to and signatories on the Gem liquidation agreement. The final amount of Lily's invoices for services to Harbor that remained unpaid was $159,650.

*Intentional misrepresentation.* Although the majority does not address the judge's findings and conclusions with respect to Lily's count for intentional misrepresentation, it is important to analyze because it underscores the insufficiency of the record to establish any willful and knowing violation of c. 93A. The judge determined that Liebovitz and Royal were liable for intentional misrepresentation to Lily because of Liebovitz's misleading nondisclosure[10] of the fact that the trucking arrangement was being made not with Royal but with another entity, Gem (doing business as Harbor). That ruling was not, however, supported by the evidence.

To the contrary, review of the record reveals that (a) there was no evidence that Liebovitz "knew" that Kessler would necessarily conclude that Lily would be contracting with Royal — indeed, the undisputed evidence was that Liebovitz never said anything to Kessler to induce such a conclusion and that Kessler merely assumed it notwithstanding Liebovitz's expressly informing him that the company in Philadelphia Lily would be servicing was Harbor Healthcare Services; (b) there was no evidence that Liebovitz "knew" that the identity of the laundry operator was material to Lily, i.e., that Lily would have refused to enter any trucking contract — particularly an informal, oral, short-term arrangement as was contemplated — had it known that the customer was not Royal but Gem (doing business as

---

[10]To prevail on a claim of tortious intentional misrepresentation, a plaintiff must generally prove "that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff [justifiably] relied upon the representation as true and acted upon it to his damage." *Barrett Assocs.* v. *Aronson,* 346 Mass. 150, 152 (1963), quoting from *Kilroy* v. *Barron,* 326 Mass. 464, 465 (1950). In certain situations, nondisclosure may amount to intentional or fraudulent misrepresentation, but only if there is a duty to disclose, a duty which arises in only a limited number of discrete situations and which extends only to facts "that are basic to the transaction, rather than those that are simply material," i.e., facts that "go[] to the basis, or essence, of the transaction." *Wolf* v. *Prudential-Bache Secs., Inc.,* 41 Mass. App. Ct. 474, 477 (1996).

Harbor), either generally or on the ground that Gem was "not a good credit risk" (also an unfounded finding, see note 6, *supra*), given the uncontradicted testimony that Lily's knowledge of Gem's involvement would have led not to a refusal to do business but to further investigation of the desirability of such business, with results not inferable from the record; and (c) there was no evidence that "it was apparent to Liebovitz that Lily was under the impression that it was working for Royal" (see note 5, *supra*).

Indeed, there was no evidence that Liebovitz was ever aware that he had conveyed such an "impression" to anyone at Lily, particularly in light of (i) Kessler's repeated concessions that any such "impression" was solely the result of his unarticulated assumption uninfluenced by anything Liebovitz ever said; (ii) Liebovitz's having clearly informed Kessler that the Philadelphia entity entering the trucking arrangement was Harbor; and (iii) Liebovitz's having promptly and emphatically instructed Napoli that the bills were properly to be sent to and paid by Harbor, not Royal.

In short, the record does not establish either culpable knowledge or purpose on Liebovitz's (or Royal's) part, or that the "nondisclosed" information was or would have been deemed by Lily to have been basic or essential to the transaction.[11] Further, Lily can hardly be said to have justifiably relied on

[11]See note 6, *supra*. In this regard, we note that, to the extent the conduct and practices of the participants in the trucking industry were relevant (a subject Kessler testified to and was questioned on by the judge), the fact that another trucking company, Cardinal, had seen fit to do business with Gem (doing business as Harbor) further undercuts the judge's assumption that Lily would never have entered any contract with Gem. The judge's focus on Leibovitz's nondisclosure of Royal's supposed involvement as the actionable conduct was modified in one respect, in that he identified Liebovitz's use of an e-mail address of royalofma@aol.com in thrice communicating with Kessler about trucking schedules in late April and early May, 1999, as a misleading representation inducing Kessler to continue to think that it was Royal and not Gem or Harbor that was the party dealing with Lily. See note 7, *supra*. Those limited communications came well after the contract had been entered into and performance undertaken, were close to the time that Lily was explicitly informed by Liebovitz that the paying customer was Harbor and not Royal, and occurred many weeks before Lily's bills began to go unpaid. Consequently, that evidence could not be regarded as temporally material or as a substantial factor in inducing the continuance, much less the establishment, of the contractual relationship which Lily complained was the cause of its ultimate

Kessler's assumption that it was dealing with Royal and not the Philadelphia entity clearly identified to it (by Liebovitz) as Harbor and as the party which was to be responsible for receiving and paying Lily's bills, particularly given Kessler's admission that had he learned of the change in billing arrangements he "would have . . . asked [for] further information on the [newly identified] company" — something no one at Lily ever did. Additionally, Lily would be charged under Pennsylvania law with notice that corporations in Pennsylvania were allowed to operate under registered "fictitious" names that might or might not reflect independent corporate identity (see note 8, *supra*).

The restricted circumstances in which tort liability for intentional nondisclosure may attach are simply not present here, where the parties were (and were represented by) sophisticated businessmen, active and experienced in the area,[12] dealing at arm's length without any fiduciary or confidential relationships or expectations. See *Swinton* v. *Whitinsville Sav. Bank*, 311 Mass. 677, 678-679 (1942); *Greenery Rehabilitation Group, Inc.* v. *Antaramian*, 36 Mass. App Ct. 73, 77 (1994); *Wolf* v. *Prudential-Bache Secs. Inc.*, 41 Mass. App. Ct. 474, 476-478 (1996). See also *Davidson* v. *General Motors Corp.*, 57 Mass. App. Ct. 637, 643 (2003) ("A business relationship is not transformed into a fiduciary relationship merely because trust was reposed by one party in the other party"); *Central Mass. Television, Inc.* v. *Amplicon, Inc.*, 930 F. Supp. 16, 25 (D. Mass. 1996) ("[t]he mere existence of a prior contractual relationship does not, by itself, create a confidential relationship or impose a duty of disclosure").

*The c. 93A claim.* The judge ruled that Liebovitz (and through

loss. Since Lily's bills were then being paid in full and the record provides no basis for concluding that, at that time, Gem (doing business as Harbor) was doomed to fail financially, Lily's loss could not be said to have been reasonably expected to result from any action or inaction in reliance on those few e-mails (indeed, there was no evidence that anyone at Lily in fact did so rely, Kessler not being involved with the ongoing arrangement after striking the deal in early April, 1999, and not communicating with anyone at Lily regarding the matter until August, 1999, see note 9 and accompanying text, *supra*). See Restatement (Second) of Torts §§ 538, 546, 548A (1977).

[12]Kessler was a graduate of Harvard College and of the Columbia Business School.

him Royal) violated G. L. c. 93A by the very same nondisclosure that he held to have constituted intentional misrepresentation — i.e., that Liebovitz had "misled Lily into believing that Royal was contracting with it (and not a financially unsound corporation) . . . [by] fail[ing] to apprise Lily of the existence of an entity other than [Royal]."[13] Such conduct was, the judge

---

[13]The judge also stated that Liebovitz's "conduct actively encouraged the impression that Royal was the contracting party." However, except for the three scheduling e-mails sent by Liebovitz from his royalofma@aol.com address weeks after the contract had been agreed on and implemented (which were in any event of little or no legal import, see notes 7 and 11, *supra*), there was no evidence in the record to support the assertion of Liebovitz's "actively encouraging conduct," an assertion which ignored the significance of his explicit statements to Kessler identifying Harbor as the involved party and to Napoli identifying Harbor as the proper recipient of bills.

The majority suggests that there was evidence of "later deceptions" by Liebovitz that "may be viewed as bearing on" Liebovitz's intent when he initially contracted with Kessler, identifying, along with the three e-mails, Liebovitz's "failure" to inform Kessler of the correction in the identity and address of the entity to be billed and Liebovitz's not telling Kessler of Harbor's ceasing to do business on or about July 23, 1999. *Ante* at 185 n.12. I view none of those subsequent and separate acts as having had a sufficiently "distinctive resemblance" or temporal nexus to the violation charged to provide the logical connection warranting their use in the fashion suggested by the majority, i.e., as relevant to the issue of Liebovitz's intent at the earlier time he entered the contract. See *Commonwealth* v. *Baker*, 440 Mass. 519, 531 (2003).

The only clear cut, contemporary civil application in Massachusetts of the "other bad act" principle developed in criminal cases in a c. 93A context appears in *Commonwealth* v. *Source One Assocs., Inc.*, 436 Mass. 118 (2002), in which the court repeated the basic criminal evidentiary rule (that "[t]o be probative, the evidence must be similar enough in nature and close enough in time to the matter in issue," *id.* at 129) but applied it only to "subsequent bad acts" that were "strikingly similar" to the deceptive acts there alleged to violate c. 93A, namely, virtually identical unlawful techniques for obtaining private information that were "distinctive." The postcontract conduct of Liebovitz identified by the majority as justifying the judge's hypothesized reliance on the principle are in no way "strikingly similar" to the conduct found by the judge to violate c. 93A — i.e., "Liebovitz[] misled Lily into believing that Royal was contracting with it (and not a financially unsound corporation) . . . [and] at the outset of the relationship failed to apprise Lily of the existence of an entity other than Lily [*sic*, intending to say Royal]." See *Commonwealth* v. *Oliver*, 60 Mass. App. Ct. 770, 775-776 (2004), *S.C.*, 443 Mass. 1005 (2005) (evidence of "subsequent conduct" — there, the failure by the defendant to offer to make reparations — to prove culpable intent had no probative value because it was "remote in time" — there, a matter of a few weeks after the date of the agreement — and was merely the product of speculative piling of inference upon inference); Liacos, Brodin & Avery, Mas-

declared, "unethical" and "clearly outside the penumbra of any established concept of fairness." I disagree. Such condemnations are inapt on the facts of this case.

Most fundamentally, although the applicability of c. 93A is in theory not limited by the scope of the common-law action for fraud (at least in cases involving consumer plaintiffs under G. L. c. 93A, § 9, see *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 703 [1975]), as matter of law even a consumer plaintiff's claim of violation of c. 93A based solely on an underlying but meritless claim for common-law fraud is itself without merit, *Macoviak* v. *Chase Home Mort. Corp.*, 40 Mass. App. Ct. 755, 760 (1996), because it "is absorbed in and vanishes with the [meritless] misrepresentation claim." *Fernandes* v. *Rodrigue*, 38 Mass. App. Ct. 926, 928 (1995). This is particularly so when

sachusetts Evidence § 4.4.6 at 155 (7th ed. 1999) ("[C]aution must . . . be exercised in the admission of such evidence").

As to the e-mails, see notes 7 and 11, *supra.* As to the billing change, it cannot rationally be deemed a "nondisclosure" of a material fact. Liebovitz promptly and clearly communicated the billing change to the appropriate person at Lily, Frank Napoli, who Kessler testified was the "ongoing manager" of the relationship "as it played out," the very man who "was the chief contact for Mark [Liebovitz] and the movement of the freight." (Kessler in fact made it clear that he had no responsibility at Lily for billing, including "whether a customer paid their bill or not.") Finally, the fact (at least as the judge found, implicitly not believing Liebovitz's testimony that he had so informed Kessler) that Liebovitz did not tell Kessler or anyone at Lily that Gem/Harbor had ceased operations in late July (a fact mentioned only once by the judge, almost in passing) appears, in the context of the entire evolving business relationship, too remote to be relevant to the issue of Liebovitz's knowledge and intent three and one-half months earlier.

At that earlier time — the only time material to the issue of the c. 93A violation found by the judge — Gem was not insolvent or failing, in any meaningful sense, but rather had realistic prospects of long-term success if it could surmount a temporarily difficult period, with Liebovitz and Kessler both looking at the relationship with Lily as only (in Kessler's words) "a very short term thing . . . going to last three to six months, maybe even shorter . . . a temporary band-aid" on the way to the ultimate long-term goal. Additionally, there appears little if any inculpatory relevance to the incident, given the testimony (by Kessler) that Liebovitz's business partners manifested an uncontradicted intent to Kessler that they would "do the best they could to get [Lily] paid and try to see that [Lily] would not get hurt" and (by Liebovitz) that Gem's shipping of laundry to Royal in fact continued after July 23, though at a reduced level, because he and his business associates were in the process of trying to sell Gem as a going concern and wanted to keep its business alive to achieve that purpose.

the c. 93A claim is not by a consumer under § 9 but by a business entity under § 11. See *Townsends, Inc.* v. *Beaupre*, 47 Mass. App. Ct. 747, 755 (1999) (§ 11 claim has no merit where it is based on claims for false representation and negligence that had no basis in the record); *Private Lending & Purchasing, Inc.* v. *First Am. Title Ins. Co.*, 54 Mass. App. Ct. 532, 539-540 (2002) (§ 11 claims which rest entirely on insufficient claims for breach of contract and misrepresentation cannot prevail); *Davidson* v. *General Motors Corp.*, 57 Mass. App. Ct. 637, 644 (2003) (§ 11 claim fails when it is entirely based on an underlying claim of breach of fiduciary duty that was without merit on the facts); *Pembroke Country Club, Inc.* v. *Regency Savs. Bank, F.S.B.*, 62 Mass. App. Ct. 34, 40-41 (2004) (claim under § 11 that is "wholly derivative" of a deficient tort claim cannot establish a c. 93A violation); *Cummings* v. *HPG Intl., Inc.*, 244 F.3d. 16, 25 (1st Cir. 2001); *Zuckerman* v. *McDonald's Corp.*, 35 F. Supp. 2d 135, 147 (D. Mass. 1999).[14]

[14]Lily's action was not based on the consumer provision of § 9 but, as the claim of a business plaintiff engaged in trade and commerce, fell under G. L. c. 93A, § 11. Appellate courts have frequently noted that businesses seeking relief under § 11 are held to a stricter standard and a higher level of acumen than are consumers in terms of what constitutes unfair or deceptive conduct. See *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 616 (1983); *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979); *Doliner* v. *Brown*, 21 Mass. App. Ct. 692, 697-698 (1986); *Madan* v. *Royal Indem. Co.*, 26 Mass. App. Ct. 756, 762-763 (1989); *Greenery Rehabilitation Group* v. *Antaramian*, 36 Mass. App. Ct. at 78-79; *Shepard's Pharmacy, Inc.* v. *Stop & Shop Cos.*, 37 Mass. App. Ct. 516, 520-522 (1994); *Davidson* v. *General Motors Corp.*, 57 Mass. App. Ct. at 643-644; *Ahern* v. *Scholz*, 85 F.3d 774, 798-800 (1st Cir. 1996). Section 11 of the statute "does not contemplate an overly precious standard of ethical or moral behavior. It is the standard of the commercial market place." *Wasserman.* v. *Agnastopoulos*, 22 Mass. App. Ct. 672, 679 (1986).

This heightened standard in § 11 cases is consistent with the general principle under c. 93A that there is no bright-line test for judging whether challenged conduct is unfair or deceptive, because the analysis always depends upon an evaluation of the context, i.e., all the particular circumstances of the individual case, *Duclersaint* v. *Federal Natl. Mort. Assn.*, 427 Mass. 809, 814 (1998), and cases cited, so that "an act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business." *Spence* v. *Boston Edison Co.*, 390 Mass. at 616. See, in this connection, *Industrial Gen. Corp.* v. *Sequoia Pac. Sys. Corp.*, 44 F.3d 40, 44 (1st Cir. 1995) (there is no general duty of disclosure under § 11, and any duty of disclosure under that provision would be limited to instances where

Even when analyzed under the general standards applicable to c. 93A claims under a "totality of the circumstances" evaluation in a business context (see note 16, *infra*), the facts of this case do not support a finding of unfairness. The classic statement regarding the considerations to be used in determining whether a practice is to be deemed unfair is whether the practice "is (1) within . . . [an] established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people." *Heller Fin.* v. *Insurance Co. of N. Am.*, 410 Mass. 400, 408 (1991). See also *Morrison* v. *Toys "R" Us, Inc.*, 441 Mass. 451, 457-458 (2004).

The only concept of unfairness that the judge saw in Liebovitz's conduct — intentional misrepresentation by nondisclosure of material facts — found no basis in the evidence, as is discussed above, and was a conclusion bereft of explanatory subsidiary findings supported by the record. See *Sidney Binder, Inc.*, v. *Jewelers Mut. Ins. Co.*, 28 Mass. App. Ct. 459, 465-466 (1990). Liebovitz was not shown to have acted knowingly or purposefully to mislead Lily while engaged in a transaction involving commercially sophisticated parties, but at most on this record could be faulted for having been "sloppy," *Shepard's Pharmacy, Inc.* v. *Stop & Shop Cos.*, 37 Mass. App. Ct. 516, 522 (1994); or having engaged in "incomplete or imperfect

the defendant is a fiduciary). This principle is also consistent with rulings under the Federal Trade Commission Act, 15 U.S.C. § 45 (2000), which is the touchstone for interpretation and application of our c. 93A, see G. L. c. 93A, § 2(*b*), (*c*), and under which courts have long required business disclosures to consumers to be much more materially complete than disclosures by businesses in their dealings with other businesses. See, e.g., *Harsam Distrib., Inc.* v. *Federal Trade Commn.*, 263 F.2d 396, 398 (2d Cir. 1959); *Giant Food, Inc.* v. *Federal Trade Commn.*, 322 F.2d 977, 982 (D.C. Cir. 1963) (both observing that the FTC Act was not intended to protect the experienced and the sophisticated).

Such a restriction on the duty of disclosure in business situations under § 11 also makes perfect sense in our largely free enterprise marketplace, for any general duty to disclose all material information in a business transaction would produce absurd, counterproductive and market-disrupting results, leading to mandatory disclosure of such critical propriety matters as cost and pricing information and depriving a party of any flexibility in negotiations by being compelled to reveal its bottom-line bargaining position. See *Schwanbeck* v. *Federal-Mogul Corp.*, 31 Mass. App. Ct. 390, 405, 414-415 (1991), reversed on other grounds, 412 Mass. 703, 710-711 (1992).

negotiations," *Madan* v. *Royal Indem. Co.*, 26 Mass. App. Ct. at 764; or having made "an error of business judgment," *Townsends, Inc.* v. *Beaupre*, 47 Mass. App. Ct. at 754; or having exhibited "ineptitude," *Churgin* v. *Hobbie*, 39 Mass. App. Ct. 302, 308 (1995); or even possibly having been negligent (although negligence does not in itself translate into a c. 93A violation in a business context in the absence of other conduct involving dishonesty or fraud, *Poly* v. *Moylan*, 423 Mass. 141, 151 [1996], cert. denied, 519 U.S. 1114 [1997]; see *Swanson* v. *Bankers Life Co.*, 389 Mass. 345, 349 [1983]; *MacGillivary* v. *W. Dana Bartlett Ins. Agency of Lexington, Inc.*, 14 Mass. App. Ct. 52, 59 [1982]).[15] Moreover, even if the evidence could be construed to charge Liebovitz with at least a suspicion that Lily

---

[15]No claim for negligence or negligent misrepresentation was ever asserted by Lily, nor discussed by the judge. A negligent act can amount to a c. 93A violation if shown to have been separately deceptive, *Glickman* v. *Brown*, 21 Mass. App. Ct. 229, 234-235 (1985), although to constitute a c. 93A violation under § 11 it would have to be "extreme or egregious." *Marram* v. *Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 62 (2004). On the issue, not discretely addressed or analyzed by the judge, whether Liebovitz's conduct could be held to have been sufficiently "deceptive" so as to be in violation of c. 93A, even if not "unfair," I note that even in the context of consumer actions there is a requirement (based on authoritative Federal Trade Commission precedent) that the purported deception be "likely to mislead consumers *acting reasonably under the circumstances*," measured on an objective, not a subjective, basis. *Aspinall* v. *Philip Morris Cos.*, 442 Mass. 381, 394-396 (2004), quoting from *Matter of Cliffdale Assocs.*, 103 F.T.C. 110, 165 (1984) (emphasis added). In a business transaction, the plaintiff's obligation to act reasonably in the circumstances is elevated, in that the evaluation of the culpability of the defendant's conduct is directly affected by the plaintiff's sophistication, the extent of what the plaintiff knew or reasonably should have known at the relevant time, and what the plaintiff failed to do to protect its own interests. See *Sheehy* v. *Lipton Indus., Inc.*, 24 Mass. App. Ct. 188, 196 (1987); *Greenery Rehabilitation Group, Inc.* v. *Antaramian*, 36 Mass. App. Ct. 77-78; *Industrial Gen. Corp.* v. *Sequoia Pac. Sys. Corp.*, 44 F.3d at 45-46. Given Lily's industry experience, its self-proclaimed vigilance in evaluating its business partners, and its knowledge from the inception (and again early in the relationship) that it was dealing with an entity called Harbor in Philadelphia, its conduct in the instant situation fell short of what might be deemed reasonable. Finally, the general concept that deceptiveness can be established by demonstrating that the recipient of the alleged deception was reasonably induced to act differently from the way it would otherwise have done, see *Duclersaint* v. *Federal Natl. Mort. Assn.*, 427 Mass. at 814, finds no application here, in the absence of evidence that Lily would not have dealt with Gem (doing business as Harbor) under any circumstances. See notes 6 & 11, *supra*.

might be confused about the corporate identity or credit-worthiness of the Philadelphia enterprise, " '[e]ven strong suspicions about a problem . . . do not give rise to a disclosure obligation' under G. L. c. 93A." *Urman* v. *South Boston Savs. Bank*, 424 Mass. 165, 171 (1997), quoting from Kutner, Chapter 93A Rights and Remedies § 12.25, at 12-14 (1996 & Supp. 1996). See also *Underwood* v. *Risman*, 414 Mass. 96, 100 (1993).

As to the remaining classic criteria for unfairness, our analysis of the evidence and the nature of Liebovitz's business conduct with respect to Kessler and Royal — objectively seen as, at most, informal, incomplete, inattentive, potentially ambiguous or somewhat equivocal — removes it from the extreme categories of "immoral, unethical, oppressive, or unscrupulous" behavior, see *Heller Fin.* v. *Insurance Co. of N. Am.*, 410 Mass. at 408, that falls afoul of § 11 because it is conduct "which a businessman would consider reprehensible." *Schwanbeck* v. *Federal-Mogul Corp.*, 31 Mass. App. Ct. at 414. Contrast *Wang Labs., Inc.* v. *Business Incentives, Inc.*, 398 Mass. 854, 857-858 (1986) (deliberate interference by an executive with a corporate colleague's position by presenting superiors with inadequate and false information about his performance in order to cause colleague's termination so as to advance executive's own interests); *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471-474 (1991) (deliberate violation of an agreement in bad faith as a pretext to coerce financial concessions from the other party that deprived the party of the fruits of the agreement); *Massachusetts Employers Ins. Exch.* v. *Propac-Mass, Inc.*, 420 Mass. 39, 42-43 (1995) (deliberate refusal to cooperate despite contractual obligation to do so, combined with refusal to obtain requisite regulatory authority while engaged in coercive conduct undertaken as leverage to destroy the rights of another party to the agreement while the agreement was still in effect, all while jeopardizing interests of consumers); *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. 1, 25-27, cert. denied, 527 U.S. 1015 (1997) (university's executives deliberately and pretextually repudiated binding agreements, usurped plaintiff's business, hired away plaintiff's employees in violation of a contractual prohibition, all in order to promote a purely

self-serving agenda); *Piccicuto* v. *Dwyer*, 32 Mass. App. Ct. 137, 138-139 (1992) (defendant deliberately violated his agreements, made unlawful demands not warranted under the agreements, engaged in campaign to sabotage the plaintiff's business relationships and harassed plaintiff with groundless complaints to police and unjustified eviction actions).

Nor were the circumstances of this single instance of contractual confusion or uncertainty of such general or public policy significance, or of such market-disrupting ramifications, as to "cause[] substantial injury to competitors or other business people." *Heller Fin.* v. *Insurance Co. of N. Am.*, 410 Mass. at 408. The purpose of c. 93A is "to improve the commercial relationship between consumers and business persons and to encourage more equitable behavior in the marketplace." *Poznik* v. *Massachusetts Med. Professional Ins. Assn.*, 417 Mass. 48, 53 (1994). That purpose would not be furthered by foisting the heavy burden of liability under § 11 upon a party to an informal contractual relationship that was initially entered into optimistically and deemed mutually favorable to both sides but which unexpectedly turned sour, with financial detriment to both. Such a commonplace casualty of our rough-and-tumble free enterprise system is simply not the type of serious marketplace misbehavior that c. 93A was aimed at.[16]

The issue of equity underscores a separate error of law infecting the c. 93A judgment. It has long been held, in business cases under the statute, that "[b]alancing the equities in the relationship of the parties [is] a major factor in determining

---

[16]"Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact . . . the boundaries of what may qualify for consideration as a c. 93A violation is a question of law." *Schwanbeck* v. *Federal-Mogul Corp.*, 31 Mass. App. Ct. at 414. The unfair conduct the judge saw here — deceiving Lily by not disclosing the identity of the party to the contract and that party's supposedly unsound financial condition — not only was premised on clearly erroneous factual findings but also appears to me to cross the boundaries of G. L. c. 93A, § 11, inappropriately in this particular business context. See note 14, *supra*. "Analyzing the situation as a whole, we see no unfair act or practice in the [defendants' conduct here complained of]." *Mechanics Natl. Bank* v. *Killeen*, 377 Mass. 100, 110 (1979). See *Ahern* v. *Scholz*, 85 F.3d at 797 (though the trial court found that the defendant had violated G. L. c. 93A, the United States Court of Appeals for the First Circuit held that it was a question of law whether the facts found rose to the level of a violation of the statute).

unfairness under G. L. c. 93A, § 2." *Mechanics Natl. Bank* v. *Killeen*, 377 Mass. 100, 110 (1979). Such a determination requires an examination of the knowledge and bargaining power of the plaintiff, as well as the plaintiff's own conduct and what it reasonably should have known. See *Swanson* v. *Bankers Life Co.*, 389 Mass. at 349-350; *Madan* v. *Royal Indem. Co.*, 26 Mass. App. Ct. at 763-764. See also note 15, *supra*.

The judge's conclusion of a c. 93A violation, however, was not supported by such an examination, particularly in light of the experience and sophistication of Lily's representative, Kessler; the fact that written contracts for transportation were common in the industry and would have identified the contracting parties; the lack of evidence of Gem's being in dire financial straights at the time the contract was entered; the fact that Gem had already succeeded in obtaining a contractual trucking relationship (with Cardinal), which Kessler never bothered to review; Lily's professed, but here disregarded, policy of undertaking complete credit checks on every new entity with which it did business; Kessler's admitted knowledge that the Philadelphia entity which sought Lily's services was called Harbor, not Royal; Lily's knowledge (and acquiescence) early in the relationship that Harbor and not Royal was to be the recipient and payor of its bills; Lily's subsequent receipt and acceptance of all payments for its services from Harbor on Harbor's checks; Kessler's concession that the emergence of a different entity in the relationship should have triggered additional inquiry; and the fact that under Pennsylvania law Lily was on notice that Harbor might be an entity distinct from Royal.

Such a weighing of the equities would, in our view, render Lily's inert assumption that it was only doing business with and would be paid by Royal unreasonable. Compare *Greenery Rehabilitation Group, Inc.* v. *Antaramian*, 36 Mass. App. Ct. at 78 (rejecting c. 93A liability in a case where there "was a negotiation and agreement between sophisticated businessmen active in real estate transactions; they were represented by counsel; the buyers made no credit check or inquiry of their own into the financial conditions of Northern Construction, nor did they request the seller to produce such information; they did

not request a guarantee of the Northern Construction Lease but now seek to exact what in effect would be a guarantee . . . . [T]he judge . . . [could not] impute to the defendants knowledge at the time of the sale that Northern Construction, which had met its obligations under the lease to that date, would soon go into default . . . a predictive insight about the future operations of a going business in relation to changing market conditions [that] would hardly fit under the heading of 'fact' and would seem at most in the nature of opinion"). See *Buster* v. *George W. Moore, Inc.*, 438 Mass. 635, 650-651 (2003) ("the plaintiffs' business vulnerabilities were . . . clearly the result of their own conduct . . . [T]he market is a rough and tumble place where a . . . lack of courtesy, generosity, or respect is neither uncommon nor in itself unlawful").

I would, accordingly, reverse the judgment and order that the same be entered for the defendants.